**Cruz LOPEZ, Individually, as Personal Representative of the Estate of Amelia Lopez, et al., Appellant,**

v.

**CITY TOWING ASSOCIATES, INC., & City of San Antonio, Appellees.**

No. 04–86–00421–CV.

Court of Appeals of Texas, San Antonio.

April 20, 1988.

Rehearing Denied July 13, 1988.

David McQuade Leibowitz, San Antonio, for appellant.

David Stephenson, Audrey A. Haake, Brock & Kelfer, Mark R. Stein, James M. Hill, Plunkett, Gibson & Allen, San Antonio, Aaron L. Jackson, Austin, for appellees.

Before CADENA, C.J., and BUTTS and CHAPA, JJ.

## OPINION

CADENA, Chief Justice.

Plaintiffs, Cruz Lopez, individually and as personal representative of the Estate of his deceased wife, Amelia Lopez, their children, Jo Ann, Ruben Serna, and Sandra Ann Lopez, and Margaret Castro, appeal from a $444,329.93 judgment in a wrongful death and survival action against City Towing and the City of San Antonio. The action arises out of an accident in which Amelia Lopez was killed when the car she was driving struck a towing cable which was stretched tautly at the level of her windshield across a public roadway in the 1100 block of Donaldson Avenue in San Antonio, Texas. At the time of the collision, a wrecker belonging to City Towing, Inc., and operated by its employee, Leroy Childs, was attempting to pull a garbage truck, belonging to the City of San Antonio, from the mud in an alley running perpendicular to Donaldson. The wrecker was parked in a driveway across Donaldson from the garbage truck. The towing cable was extended across Donaldson from the rear of the wrecker to the front bumper of the garbage truck. No warning devices, barricades or flagmen had been posted to warn motorists of the presence of the cable.

Plaintiffs are decedent's husband, her minor daughter and her adult children, and her mother. In their suit they alleged that the defendants were negligent in failing to take adequate safety precautions during the attempted recovery of the garbage truck, and that such failure constituted gross negligence.

Plaintiffs also alleged that City Towing was negligent in hiring Childs and in failing to properly equip and maintain the wrecker. Defendants denied liability and alleged that Mrs. Lopez was herself negligent.

A jury found City Towing to be 80% negligent, the City to be 16% negligent, and Mrs. Lopez to be 4% negligent. A joint and several judgment was rendered against defendants for $444,329.93 together with pre- and post-judgment interest and costs. Neither defendant was found to be grossly negligent and no exemplary damages were awarded. From this judgment plaintiffs have perfected their appeal. They bring 19 points of error, and defendants raise a cross-point.

## EXCLUSION OF THE COLLISION RE-ENACTMENT VIDEOTAPE

Plaintiffs complain of the refusal of the trial court to admit in evidence a video-

tape reenactment of the accident prepared by City Towing.

Evidence of an experiment made out of court is admissible when there is substantial similarity between conditions existing at the time of the occurrence giving rise to the litigation and at the time the experiment is conducted. *Fort Worth & D. Ry. Co. v. Williams,* 375 S.W.2d 279, 281–82 (Tex.1964).

In this case there is an important difference between the videotape and the events existing at the time of the accident. The videotape was prepared to represent on film what Mrs. Lopez would have seen as she approached the cable, but the tape did not show the cable stretched across the street. In the words of the photographer who made the tape, the cable "disappear[ed] between the lines of the video tape." The photographer testified that he was able to see the cable with his naked eyes while riding in a car two to three hundred feet away, but that he was not successful in recording what the eye could see. As the supreme court said in *Williams,* care and caution must be exercised in admitting this type of experiment evidence when the videotape purports to represent what the human eye could or could not see. 375 S.W.2d at 282.

Since the cable was visible to the witnesses of the accident—although the degree of visibility and when Mrs. Lopez could have first seen the cable were contested—the videotape failed to show the cable, the trial judge could have concluded that confusion would have occurred and that the differences between the actual occurrence and the film representation of the occurrence were incapable of explanation to the jury. When the question for decision is whether the trial court abused its discretion, the appellate court is not to substitute its judgment for that of the trial court, but must decide whether the trial court's decision was arbitrary or unreasonable. *Landry v. Travelers Ins. Co.,* 458 S.W.2d 649, 651 (Tex.1970). Plaintiffs have failed to show that the trial court abused its discretion in refusing to admit the videotape.

## APPORTIONMENT OF PEREMPTORY CHALLENGES

Plaintiffs next complain of the apportionment of peremptory challenges by the trial court. Six strikes were awarded to the plaintiffs and four strikes to each of the defendants, who were required to strike separately.

■ In a case involving multiple litigants on one side of a lawsuit, the question to be answered in allocating strikes is whether any of the litigants on the same side are antagonistic with respect to a question that the jury will decide. *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914, 918 (Tex.1979). Where no antagonism exists, each side must receive the same number of strikes. *Id.*

■ Antagonism exists when each of the defendants alleges that the fault of another defendant was the sole cause of plaintiff's damage. *Patterson,* 592 S.W.2d at 918; *Shell Chemical Co. v. Lamb,* 493 S.W.2d 742, 745 (Tex.1973); *Tamburello v. Welch,* 392 S.W.2d 114, 116 (Tex.1965). Here, City Towing alleged in a third party action that the City was responsible in whole or in part for the negligence alleged by plaintiffs. The City and City Towing were thus antagonistic on the issue of whether the City's negligence was the sole cause of plaintiffs' injuries.

The defendants were antagonistic in a second regard. The City, in a cross-action, alleged that its employees were the borrowed servants of City Towing, thus contending that any liability in damages for actions of the garbage truck crew was the sole responsibility of City Towing. This creates antagonism between the defendants. *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 5 (Tex.1986).

Finally, although the existence of cross-actions is not alone determinative, *Patterson,* 592 S.W.2d at 918, we note that the City and City Towing each sought indemnity and/or contribution from each other in cross-actions. We cannot say that the defendants were not so antagonistic to each other based on the information the trial court had before it at the time it appor-

tioned strikes, that the apportionment of six to four to four, especially coupled with the requirement that the defendants strike separately, produced an unfair advantage for defendants.

## JURY MISCONDUCT

■ Plaintiffs argue that the trial court erred in overruling their motion for new trial which alleged jury misconduct. We disagree. Both TEX.R.CIV.P. 327(b) and TEX.R.CIV.EVID. 606(b) provide:

> A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning is mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The two juror affidavits attached to plaintiffs' motion for new trial concern, with one possible exception, matters occurring during the course of the jury's deliberations. These are inadmissible to show alleged jury misconduct. The "outside influence" spoken of in the rule must emanate from outside the jury and its deliberations. *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 850 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Clancy v. Zale Corp.*, 705 S.W.2d 820, 829 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

■ The only possible allegation of "outside influence" occurs in the affidavit of juror Thomas Howard. He speculates that the foreman had reached agreements outside the jury room with either some unknown person or with certain other jurors. Such speculation does not raise an issue of jury misconduct. The juror affidavits must be "based upon knowledge and not suspicion or hope." *Roy Jones Lumber Co. v. Murphy*, 139 Tex. 478, 163 S.W.2d 644, 646 (1942).

■ Because plaintiffs failed to show by their affidavits the existence of material jury misconduct, the court did not err in failing to hear evidence on the motion. *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d at 850; *Robinson Electric Supply Co. v. Cadillac Cable Corp.*, 706 S.W.2d 130, 132 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Consequently, the court did not err in overruling the motion for new trial on this issue.

## EXCLUSION OF EXPERT ECONOMIST'S TESTIMONY

■ Plaintiffs next complain that the trial court erred in excluding the testimony of an economist regarding the value of lost guidance, counselling, love, affection, companionship and society suffered by plaintiffs. The economist's testimony was developed by plaintiffs in a bill of exception. The economist used a "substitution of services" theory to establish a dollar value for these damage elements. He testified that the guidance and counselling Mrs. Lopez would have provided for Jo Ann Lopez for the two-year period between the time of her death and Jo Ann's eighteenth birthday could be compared with the character of services provided by a school teacher. For those two years he determined that the salary of a Texas school teacher would have been $56,588.00.

As his yardstick, for his valuation of the elements of love, affection, companionship and society, the economist calculated the average earnings of the "helping professions"—the clergy, psychologists, social workers and counselors—the professions that attempt to provide the same kinds of benefits provided by a mother. He arrived at a figure of approximately $10.00 per hour. He then calculated this rate at one hour per day over Mrs. Lopez' life expectancy which resulted in a figure of $109,500.00 for each child. The same calculations were made for Cruz Lopez and Margaret Castro with the exception that the loss of one hour per day was calculated over their life expectancies rather than decedent's because both were older than dece-

dent. His valuation for these plaintiffs at one hour per day was $57,000.00 each.

Defendants argue that the economist's testimony was properly excluded because he was not shown to have any expertise in counseling, guidance and the other intangibles associated with plaintiffs' non-pecuniary losses; his opinions, therefore, were conjectural and speculative in nature. His opinions, defendants argue, would have been more likely to prejudice or confuse the jury rather than to have assisted them. Defendants also contend that the jury has an equal if not superior ability to make these calculations based on their own experience, and based on the testimony of the plaintiffs and "approximately twenty other witnesses for the plaintiffs."

A trial court has broad discretion in deciding whether to admit expert testimony, and its decision will not be disturbed unless there is an abuse of discretion. *Herrera v. FMC Corp.*, 672 S.W.2d 5, 7 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). When the jury is equally competent to form an opinion regarding the ultimate fact issues, there is no abuse of discretion in the exclusion of the expert's testimony. *Id.* Here, the plaintiffs presented numerous witnesses who testified regarding Mrs. Lopez' special relationship with her family. Based upon this testimony and the jury's own experiences, we believe they were capable of placing a dollar figure on plaintiffs' damage elements. We find no abuse of discretion.

LOST EARNING CAPACITY UNDER THE SURVIVAL STATUTE

 Plaintiffs argue that the trial court erred in excluding issues on damages under the Texas survival statute for the lost earning capacity of the decedent. They argue that by the literal terms of the statute, TEX.CIV.PRAC. & REM.CODE § 71.021 (Vernon 1986), damages recoverable by the estate of an individual dying as a result of personal injuries are identical to those recoverable in an action by a living victim. Because loss of future earnings and diminished future earning capacity are recoverable by a living victim of personal injuries, it therefore follows that they are

recoverable by a deceased victim's estate. This argument must fail. A decedent's estate has no cause of action in Texas for lost future earnings. *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 632 (Tex. 1986).

Plaintiffs also argue that Mrs. Lopez' death deprived her estate of her future earnings, and to deny recovery of these damages denies full recovery to her estate and allows the tortfeasor a windfall. *See* Rubenstein, *Personal Injuries and the Texas Survival Statute: The Case for Recovery of Damages for a Decedent's Lost Future Earnings*, 12 ST. MARY'S L.J. 49, 72 (1980). By its holding in *Yowell*, the supreme court took a different approach to the concept of full recovery by allowing recovery of loss of inheritance damages under the wrongful death statute. The court said:

> In Texas, the plaintiffs do not receive a double recovery when they receive loss of inheritance damages because the decedent's estate has no cause of action for lost future earnings.

*Yowell*, 703 S.W.2d at 632. Thus, the decedent's estate is not permitted to recover lost future earnings under the survival statute, but the beneficiaries are permitted loss of inheritance recovery under the wrongful death statute. As the supreme court explained:

> Recovery for loss of inheritance is proper. Had the injured person survived, his recovery would include lost future earnings which presumably would increase the personal estate and, at death, pass to heirs or beneficiaries. Preventing the heir's recovery would protect the wrongdoer from the consequences of the wrong.

*Id.*, at 633.

Thus, lost future earnings are not recoverable under the survival statute. We must therefore reject plaintiffs' related argument that the trial court erred in excluding the economist's testimony regarding Mrs. Lopez' lost earning capacity under the assumption that she would have obtained a college degree. As plaintiffs recognize, this point is conditioned on the correctness

of the prior point—that lost earning capacity is a recoverable element of damages under the survival statute.

## NEGLIGENCE OF CITY TOWING

██ Plaintiffs contend that the trial court erred in failing to grant their motion for new trial because the jury's answer to Special Issue No. 3 is against the great weight and preponderance of the evidence. That special issue and its answer read as follows:

Do you find from a preponderance of the evidence that on the occasion in question CITY TOWING ASSOCIATES INC., through the acts of its agents, servants and/or employees, other than the conduct of Leroy Childs, was negligent?

Answer "Yes" or "No."

Answer: No

This special issue was submitted in an attempt to show that City Towing was negligent in employing Childs because he was unfit for the job he was hired to perform, and in failing to properly equip and maintain Unit 300, the wrecker sent to the scene.

In reviewing a factual sufficiency challenge, we must consider and weigh all the evidence, and may set aside the jury finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

The evidence offered on this issue came from Steve Vacker, City Towing's general manager; Franklin Keilman, president and chairman of the board of City Towing; Harold Lawrence, City Towing's big truck supervisor at the time and the person under whom Childs had received most of his training; Martin Gonzalez, Unit 300's primary driver; and Childs.

There is evidence that Childs had sufficient training and experience to handle the tasks he was assigned at City Towing. He had had twenty years of experience driving big trucks prior to his employment at City Towing. This is valuable experience because it familiarizes one with driving heavy equipment and pulling heavy loads. For three weeks prior to his employment he had been used by City Towing as a contract laborer and had helped them with several tractor-trailer rollovers which are recovery type operations as opposed to towing operations. A towing operation is a simple matter of putting chains on a vehicle and towing it. A recovery operation, on the other hand, is more complex and usually involves vehicles that are turned over or stuck in a hole or a ditch.

After he was hired, Childs underwent a two week training program where he was trained in the operation of a small tow truck. During this period he was exposed to a wide variety of accidents, situations and tows. Keilman stated that the training included teaching drivers how to determine when they need to call for help on a particular job. Childs had been working for City Towing approximately four months prior to the accident. He had begun working on large tow trucks about one month after he was hired, although most of his experience was on small tow trucks. Vacker stated that there is no difference between small tow trucks and large ones other than the size; the hook-ups and maneuvers are the same. Vacker, Keilman and Gonzalez all said that Childs was capable of performing his job. Childs said that he felt comfortable handling the large wrecker by himself. The task of pulling the garbage truck out of the mud was described as a simple recovery operation.

Plaintiffs' central point regarding Childs' alleged incompetence concerns the distinction between towing and recovery operations. While they admit that Childs may have been competent to perform simple towing operations, they contend that the preponderance of the evidence establishes that he was not competent to perform a recovery operation on his own. Most of Childs' recovery experience under Lawrence involved unloading cargo and watching the hook-ups. Childs did not actually participate in the hook-up and winching operations. Lawrence felt Childs was capable of towing a vehicle with the large tow truck, but that he did not have enough experience to perform a recovery operation alone.

Plaintiffs also offered evidence to support their claim that City Towing failed to properly maintain and equip Unit 300. Childs testified that on the morning of the accident the emergency beacon lights on the top of Unit 300's cab were not working. He also testified that there were no orange cones or barricades for controlling traffic on Unit 300. He added that the throttle on the back of the truck was not working and had not been working when he had used Unit 300 two to three weeks earlier. The rear throttle allows the operator, working at the rear of the truck, to increase the speed of the engine in order to allow the winch to take up the tow cable faster. Childs stated that Daniel Mendoza, one of the garbage truck crew, was flagging traffic on Donaldson to the east of the two trucks—the direction from which Mrs. Lopez approached the cable. The broken throttle caused Childs to ask Mendoza to get into the cab of the tow truck, apply the brakes and accelerate the engine so the winch would operate faster and so the tow truck would not roll backwards. It was while Childs was showing Mendoza how to apply the brakes when Mrs. Lopez struck the cable.

However, there was also substantial evidence presented that Unit 300 was properly equipped and maintained. Vacker testified that City Towing trucks carry pyramids (triangular reflectors) and flares. He said that he looked in the tool box when Unit 300 returned to the yard after the accident and saw that it had flares, and that Childs knew how to use them. Vacker also testified that two of the three beacon lights on top of the cab were working when the truck was brought back. He testified that all of the trucks are checked by their mechanics once a month and that the check includes the lights and other safety equipment on the trucks in addition to preventive maintenance procedures. He also testified that the rear throttle should not have been necessary because the motor of a large wrecker should have had enough power to pull the garbage truck out of the mud.

Keilman testified that as far as he knew the brakes, beacons and throttle control on Unit 300 were all in working order. Gonzalez had driven Unit 300 a couple of days before the accident and said the brakes and rear throttle were working and that all three beacon lights were working except that one was working slowly. He said that the truck had flares, flags and reflectors.

Having reviewed all the evidence, we cannot say that the jury's answer to Special Issue No. 3 was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Despite plaintiffs' distinction between towing and recovery operations, there is sufficient evidence from Vacker, Gonzalez and Keilman that Childs was capable of performing simple recovery operations by himself. Likewise, there is ample evidence that the brakes, lights and throttle of Unit 300 were in working condition, and that it was equipped with emergency warning devices.

■ Plaintiffs also complain of the exclusion of the testimony of Clifford Park, a motorist who was present at the scene of the accident. Park testified by bill of exception that immediately after Mrs. Lopez struck the cable he asked Childs why there were no flagmen or flares to warn about the danger of the cable. Childs responded that he was too busy trying to winch the garbage truck out of the mud to put signs out. Defendants' hearsay objections were sustained when this testimony was initially offered. Park also testified in the bill of exceptions that he overheard a police officer at the scene of the collision state that this situation was not normal procedure and that there should have been a squad car called out to control traffic. Again, on initial offer of this testimony, hearsay objections were sustained. Plaintiffs argue that the statements offered are not hearsay or, if they are, they fall within numerous exceptions to the hearsay rule.

Any error in not admitting or excluding evidence becomes immaterial where such evidence does not affect the verdict and judgment rendered. To obtain a reversal of the judgment for exclusion of evidence, plaintiffs must show that the rejection of the proffered testimony was error and was

reasonably calculated to and probably did cause the rendition of an improper judgment. *Schutz v. Southern Union Gas Co.*, 617 S.W.2d 299, 303 (Tex.Civ.App.—Tyler 1981, no writ); *Swinney v. Winters*, 532 S.W.2d 396, 403 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.). Even assuming it was error to exclude the testimony, plaintiffs have failed to discharge their burden to show that the error was harmful. There was much testimony that Childs had not seen fit to block off the street, to call for police assistance, or to flag traffic once he had removed Mendoza from the job. The evidence offered was merely cumulative, and the error, if any, was not reasonably calculated to cause and did not cause the rendition of an improper judgment. TEX.R.APP.P. 81(b)(1).

■ Plaintiffs also argue that the trial court erred in failing to take judicial notice of the contract between the City and City Towing whereby City Towing was to perform towing services for the City. Plaintiffs argue that the contract outlined the services to be performed by City Towing and the standards to be met by City Towing in performing these services. A breach or failure to meet these standards, plaintiffs argue, was relevant as evidence supporting a finding of negligence and exemplary damages against City Towing. Although plaintiffs requested the trial court to take judicial notice of the contract, they failed to obtain a ruling on their motion. By failing to obtain a ruling, plaintiffs have failed to preserve error on this point. *Ballard v. King*, 652 S.W.2d 767, 769 (Tex. 1983).

## NEGLIGENCE OF MRS. LOPEZ

■ Plaintiffs next contend that there was no evidence or, alternatively, insufficient evidence to support the submission to the jury of special issues regarding the negligence of Mrs. Lopez. The insufficient evidence points are overruled and we review only the no evidence points. A trial court is required to submit an issue if there is any evidence presented with respect to that issue. *Huckaby v. Henderson*, 635 S.W.2d 129, 131 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). A contention that an issue should not have been submitted because of the insufficiency of the evidence can only mean that there is no evidence to warrant submission of the issue. *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965). We will thus apply the "no evidence" test in determining whether the issues should have been submitted. *Bounds v. Caudle*, 560 S.W.2d 925, 930 (Tex.1977).

■ Plaintiffs argue that if a person cannot reasonably anticipate or have knowledge of a danger, she cannot be charged with contributory negligence because without such knowledge, the duty to guard against the danger does not arise. *J.R. Beadel & Co. v. De La Garza*, 690 S.W.2d 71, 73 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). While there is no duty to anticipate the negligent conduct of another, Mrs. Lopez was nevertheless under a duty to use ordinary care to prevent injury to herself. *Patino v. Furr's Supermarkets*, 512 S.W.2d 54, 56 (Tex.Civ.App.—El Paso 1974, writ ref'd n.r.e.). This included a duty to keep a proper lookout. *Id.* A proper lookout means that Mrs. Lopez must have looked in such an intelligent manner as to enable her to see what a person in exercise of ordinary care and caution for the safety of herself and others would have seen under like circumstances. *Id.* at 57. It means also that Mrs. Lopez must have taken such steps to guard against accidents which the conditions observed by her would necessarily indicate to be necessary. *Id.*

There was evidence that both the tow truck and the garbage truck were large vehicles painted in bright safety colors, that the garbage truck was stuck in the mud at an unusual angle, that the tow truck was situated directly across the street from the garbage truck with its rear end facing that truck and with its rear end protruding several feet into the street. There was testimony that the cable stretched across Donaldson was visible to other motorists and to persons living in the neighborhood. Park, who had approached the scene from the opposite direction of

Mrs. Lopez, testified that he was able to see the trucks in their unusual locations, to realize the potential danger the situation presented, to slow his speed, to locate the cable, and to pull his vehicle to the side of the road before hitting the cable. Finally, there was evidence that Mrs. Lopez failed to reduce her speed or to apply her brakes as she approached the cable. There was probative evidence to support the submission of these issues to the jury.

■ Plaintiffs complain that the trial court erred in excluding Park's testimony regarding his special knowledge and skills of observation. In a bill of exceptions Park testified that as a police chaplain for three years he primarily rode on patrol duty with officers where he observed many wrecks and accidents. Based on this experience he rated himself as a driver who is above average in observation and prudence. He also testified that for five years he had worked in the maximum security ward of a state mental hospital and that in that position he had deliberately developed his peripheral vision to protect himself from threats coming from the side of his visual focus.

Defendants argue that this experience was irrelevant because it was in no way similar to the situation encountered by Mrs. Lopez, and because it did not apply to Park's skills as a driver. They also assert that Park's opinion that he was an above average driver is a legal conclusion which he as a lay witness was not qualified to make. Plaintiffs contend that these experiences were relevant as to Park's ability to perceive the cable, and would have precluded the jury from automatically equating Mrs. Lopez' ability to see the cable with that of Park. The denial of this evidence, plaintiffs urge, probably allowed the jury to conclude that because Park saw the cable in time to stop, Mrs. Lopez also should have.

Relevant evidence is:
evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

TEX.R.CIV.EVID. 401. Whether Mrs. Lopez was keeping a proper lookout as she drove down Donaldson was a material fact relating to her alleged contributory negligence. Whether another driver could see the cable and stop in time was probative of whether Mrs. Lopez could have and should have seen the cable in time to stop. However, if the other driver who was able to stop had acquired skills and training or had developed a heightened awareness and visual perception which would enable him to more quickly perceive the dangerous situation, it would tend to make it less probable that Mrs. Lopez had not maintained a proper lookout. Hence, the evidence regarding Park's prior experiences was relevant and should have been admitted.

■ This does not mean, however, that the error in excluding the testimony is reversible error. To reiterate, it is plaintiffs' burden to show that the exclusion was harmful. *Schutz v. Southern Union Gas Co.*, 617 S.W.2d at 303. In light of the evidence showing that other observers were able to see the cable, we cannot say that the exclusion of the evidence was reasonably calculated to cause and did cause the rendition of an improper verdict. TEX.R.APP.P. 81(b)(1).

## INADEQUACY OF DAMAGES

In legal and factual sufficiency points, plaintiffs contend that the evidence supports substantially larger damage awards. They cite to no specific evidence, but instead support their contention with general arguments that the jury disregarded the evidence and the court's charge, and by reference to their jury misconduct argument previously discussed.

■ It is extremely difficult to determine the pecuniary value of a spouse aside from actual monetary contributions made to the marriage. Thus the law vests the jury with considerable discretion and latitude in drawing upon their own knowledge, experience and sense of justice, guided by proper instructions of the court. *Malone & Hyde, Inc. v. Hobrecht*, 685 S.W.2d 739, 747 (Tex.App.—San Antonio 1985, writ

dism'd by agr.). Unless their finding is so excessive or grossly inadequate as to indicate the operation of an improper influence in determination of the amount, it will not be disturbed on appeal. *Colley v. Carleton*, 571 S.W.2d 572, 576 (Tex.Civ.App.—Corpus Christi 1978, no writ). Here, the record shows that Mrs. Lopez was a 49 year old housewife who recently retired from a part-time job at a day care center. Although she had expressed a desire to return to college and obtain a teaching certificate, she had not been admitted to a college. Cruz Lopez was the primary financial support for the family; Mrs. Lopez' earnings were used to provide "extras" for the family. She was survived by two adult children and one minor child. Appellants fail to point to evidence tending to support higher awards. The damage awards must stand.

## CROSS–POINT: LOSS OF INHERITANCE

 Defendants argue in their cross-point that the trial court erred in submitting special issues concerning loss of inheritance on the parts of the plaintiff children because there was no evidence to support the submission or the finding of loss of inheritance by the jury. The jury awarded each of the plaintiff children $10,000.00 as loss of inheritance damages.

The supreme court has approved of loss of inheritance as an element of damages in wrongful death actions in *Yowell*, 703 S.W. 2d at 633. Loss of inheritance damages are defined as:

> the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death.

*Id.* Under a loss of inheritance claim, the claimant must prove not only the probability that the deceased would have accumulated money or assets, but also the probability that the decedent would have left this accumulation by will or inheritance to the statutory beneficiaries. *Id.* at 632.

 Defendants complain that plaintiffs failed to introduce any testimony of the probability that Mrs. Lopez would have accumulated money or assets and would have left its accumulation to the statutory beneficiaries. On the contrary, the record indicates that Mrs. Lopez had worked ten years in a day care center prior to the accident and had only quit her job one month before the accident. During her time at the day care center Mrs. Lopez obtained her G.E.D. and was promoted to teacher's aide and then to a teacher's position. Testimony indicated that Mrs. Lopez wanted to obtain a college degree so that she could return to work as an elementary school teacher or as a substitute teacher. There was testimony that Mrs. Lopez' earnings were not used to support the family, but were used to provide extra things for the family, primarily for the children. Finally, there was extensive testimony of Mrs. Lopez' close and loving relationship with the members of her family. We hold that there is some evidence to support the jury's findings of loss of inheritance damages.

The judgment of the trial court is affirmed.

CHAPA, Justice, dissenting.

I respectfully dissent.

Although I agree that the trial court committed error in refusing to admit the evidence of witness Park's acquired skills and training which enabled him to more quickly perceive the dangerous situation, I do not agree that the error was harmless.

The court justifies its conclusion that the trial court's error was harmless on the basis that other observers were able to see the cable. I disagree.

The other observers relied upon by the court were

1) residents of the neighborhood who were able to see the cable because they observed the recovery operation for 15 to 20 minutes, after having had their attention focused on the recovery operation by the initial noise and vehicle movement into place, and by the activities of the safety

flagman who was warning motorists prior to the arrival of Lopez at the scene;

2) a motorist traveling 2 to 3 car lengths behind Lopez, who was unable to see the cable or anything suspicious until Lopez' auto hit the cable; and

3) a motorist who drove down the same street shortly before Lopez, whose attention was focused by the sudden braking and turning around of the cars in front of him, by the warnings of the flagman who was still in place, and who after slowing down due to these warnings was able to see the cable only within 25 feet and stop in his car only 6 feet away from it.

Parks was a motorist approaching the scene from the opposite direction of Lopez who was able to see the cable in time to stop although the flagman was no longer in the street warning motorists. However, the trial court refused to admit evidence of his special skills and training in observing dangerous situations, and thus committed error.

It is obvious that Parks is the only witness who was in a situation similar to Lopez. The other "observers" had the advantage of observation for a long period of time, stationary close positions to the scene, and having their attention focused by the positioning of the recovery vehicle and the activities of the safety flagman. Lopez had none of these advantages. Further, Parks had the advantage of special skills and training which enabled him to more quickly perceive the dangerous situation, which Lopez did not have. Since Lopez was prevented from showing this to the jury, the court committed reversible error.

Considering the strong concentration of the defense in final argument on Parks' testimony, it was also obvious to the defense that Parks was the critical and only witness in a situation similar to Lopez. Assuming, as we reasonably can, that this was also obvious to the jury, I must conclude that the exclusion of this evidence was reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case. Because it is impossible to forecast how the jury would

have apportioned the negligence to the parties had it been able to consider the excluded evidence, the judgment should be reversed and the case remanded for a new trial.