**C & H NATIONWIDE, INC., Edward Stanton Webber, and Ecotech International, Inc., Petitioners,**

v.

**Linda Gail THOMPSON, Individually and as Executrix of the Estate of Gary Wayne Thompson et al., Respondents.**

No. D–1326.

Supreme Court of Texas.

June 22, 1994.

Randall D. Wilkins, Houston, James K. Peden, III, Dallas, H. Lee Lewis, Jr., Houston, Edward J. Hennessy, Houston, for petitioners.

Lee L. Kaplan, Andrew Schirrmeister, III, Dale Harvill, Houston, for respondents.

PHILLIPS, Chief Justice, delivered the opinion of the Court as to Parts I, II, III, & V, in which GONZALEZ, HIGHTOWER, HECHT, CORNYN, ENOCH and SPECTOR, Justices, join, and an opinion as to Part IV, in which HIGHTOWER and SPECTOR, Justices, join.

Our prior opinions are withdrawn and the following is substituted.[1]

In this wrongful death case we consider how liability is to be allocated among defendants under our Comparative Responsibility Law, TEX.CIV.PRAC. & REM.CODE ch. 33. We also conclude that the evidence in this case is insufficient to support an award of damages for lost inheritance, and that prejudgment interest may be awarded on future damages under TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(a) (Vernon 1986 & Supp.1994). The judgment of the court of appeals is reversed, 810 S.W.2d 259, and the case is remanded to the trial court for further proceedings.

# I

Jerry Wayne Thompson was driving down the highway when a 40′ piece of pipe weighing 1100 pounds fell off a truck coming toward him and hit his car. Thompson was killed. His wife and children brought this action to recover damages for Thompson's injuries and death. They sued four groups of defendants:

● the lessor and driver of the truck, C & H Nationwide, Inc. and Edward Stanton

---

1. The Court has unified its previous opinions, as we did today in *Ellis County Bank v. Keever,* 888 S.W.2d 790 (Tex.1994).

Webber, respectively—collectively, "C & H";

● the owners of the pipe, Shell Oil Company and Shell Western E & P, Inc.—collectively, "Shell";

● the company from which the pipe was shipped, Energy Coatings Company; and

● the company Shell hired to monitor the handling and loading of the pipe at the Energy Coatings facility, Ecotech International, Inc.

Before trial, Shell paid plaintiffs $3 million in full and final settlement of plaintiffs' claims against it. C & H also paid plaintiffs $3 million (in four installments) prior to trial, but not in full settlement of plaintiffs' claims. C & H's payments were made in accordance with a letter agreement between counsel for plaintiffs and C & H which stated that:

● the money paid by C & H "will be treated as an advance toward any judgment which might be entered" against C & H or its insurers;

● plaintiffs' pleadings would be amended to claim no more than $8.5 million actual damages because "in fairness" no greater amount should be sought, given the degree of responsibility C & H bore for the accident, as indicated by discovery;

● plaintiffs' pleadings would also be amended to drop any claims of gross negligence or punitive damages against C & H because C & H was out of business and "the development of the case" had indicated that C & H "in all likelihood [was] not guilty of any conduct giving rise to a claim for punitive damages;

● plaintiffs would indemnify C & H from liability in excess of $8.5 million on account of any claim by another defendant; and

● plaintiffs would not settle with any other defendants without C & H's approval.

The agreement between counsel for C & H and the plaintiffs concluded: "This arrangement is not a settlement nor is it intended to be one. It is simply an effort to streamline the issues, to reduce the number of disputed issues prior to trial...."

The jury found each group of defendants negligent, allocating responsibility for causing the accident 50% to C & H, 30% to Ecotech, 15% to Shell, and 5% to Energy Coatings. The jury assessed the following damages:

| | |
|---|---|
| pecuniary loss | $1,600,000 |
| loss of companionship and society | 2,400,000 |
| mental anguish | 3,000,000 |
| loss of inheritance | 200,000 |
| Thompson's pain and suffering before death | 1,000,000 |

In addition, the parties stipulated to funeral expenses of $5,720.35. Plaintiffs' damages thus totaled $8,205,720.35. The jury was not asked to, and therefore did not, segregate damages incurred in the past from those to be incurred in the future.

The court calculated prejudgment interest based upon a "principal" equal to the total damages found or stipulated—$8,205,-720.35—reduced by settlement payments or offers from time to time during the period of accrual. Thompson was killed on November 18, 1987, and this action was filed ten days later. The trial court determined that prejudgment interest accrued from May 18, 1988, 180 days after suit was filed, until January 23, 1990, the date of judgment. C & H made its first payment of $100,000 to plaintiffs on May 6, 1988, and the trial court credited it against the "principal" as of May 18. C & H made its other three payments, one of $900,000 and two each of $1 million, on January 25, February 13, and February 17, 1989, respectively. The trial court found that Energy Coatings made written settlement offers to plaintiffs in the amount of $250,000 on April 3, 1989, and $750,000 on July 21, 1989. Although the court found that these offers terminated when jury selection began on September 26, 1989, the court did not accrue interest on these amounts after that date. The trial court found that Ecotech made a written settlement offer to plaintiffs in the amount of $100,000 on July 10, 1989, and that this offer remained extant to the date of judgment. Shell paid plaintiffs $3

million on July 20, 1989. Based upon these findings, the trial court calculated prejudgment interest at the rate of 10% per annum as follows:

| DATE | DAYS | INTEREST | PAID OR OFFERED | "PRINCIPAL" |
|---|---|---|---|---|
| 11/18/87 | | | | $8,205,720.35 |
| 11/20/87 | | | | |
| 05/06/88 | | | $ 100,000.00 | |
| 05/18/88 | | | | $8,105,720.35 |
| 01/25/89 | 252 | $559,627.82 | $ 900,000.00 | $7,205,720.35 |
| 02/13/89 | 19 | $ 37,509.23 | $1,000,000.00 | $6,205,720.35 |
| 02/17/89 | 4 | $ 6,800.79 | $1,000,000.00 | $5,205,720.35 |
| 04/03/89 | 45 | $ 64,180.11 | $ 250,000.00 | $4,955,720.35 |
| 07/10/89 | 98 | $133,057.70 | $ 100,000.00 | $4,855,720.35 |
| 07/20/89 | 10 | $ 13,303.34 | $3,000,000.00 | $1,855,720.35 |
| 07/21/89 | 1 | $ 508.42 | $ 500,000.00 | $1,355,720.35 |
| 01/23/90 | 186 | $ 69,086.02 | | |

The total interest thus calculated amounted to $884,073.43.

All three defendants that remained liable to plaintiffs—C & H, Ecotech, and Energy Coatings—elected under TEX.CIV.PRAC. & REM.CODE § 33.014(a) [1] to have the damages recovered by plaintiffs reduced by "the sum of the dollar amounts of all settlements", id. § 33.012(b)(1). [2] Accordingly, the trial court reduced plaintiffs' damages by the $6 million they received from Shell and C & H. Defendants disagreed, however, over how this reduction should affect their respective liabilities. We describe this disagreement in more detail below. In brief, Ecotech and Energy Coatings argued that the entire $6 million should be credited to plaintiffs' damages before liability was apportioned among the defendants. The credit would thus be shared by all three defendants, basically in proportion to the percentage of fault assigned each of them by the jury. C & H argued that Ecotech and Energy Coatings should not benefit from its payments to plaintiffs. Instead, C & H contended that plaintiffs' damages should be reduced only by the $3 million paid by Shell, and that liability apportioned among defendants. C & H argued that the $3 million it paid should be credited solely against its own liability. The trial court accepted Ecotech and Energy Coatings' argument and rejected C & H's.

Based on the jury's allocation of responsibility, the trial court held that C & H and Ecotech are jointly and severally liable to the plaintiffs for all damages awarded by the judgment, and that Energy Coatings is liable for 5/85ths of the judgment. C & H was given a right of contribution against Ecotech for 30/85ths of the judgment, and C & H and Ecotech were each given a right of contribution against Energy Coatings for 5/85ths of the judgment. The trial court denied Ecotech and Energy Coatings contribution against C & H.

The court of appeals reversed only one part of the trial court's judgment. 810 S.W.2d 259. The appeals court held that prejudgment interest should have been assessed on the difference between the total damages awarded and the settlement credit, or $2,205,720.35, rather than on the total damages awarded by the jury, or $8,205,720.35. The court remanded the case to the trial court to recalculate prejudgment interest. In all other respects the trial court's judgment was affirmed.

1. "If a claimant has settled with one or more persons, an election must be made as to which dollar credit is to be applied under Section 33.012(b). This election shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and, when made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subdivision (2) of Section 33.012(b)."

2. "If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, as elected in accordance with Section 33.014: (1) the sum of the dollar amounts of all settlements...."

## II

We first consider the proper allocation of liability among defendants under the Comparative Responsibility Law, TEX.CIV.PRAC. & REM.CODE §§ 33.001–.016.

### A

C & H argues that the lower courts did not properly credit its pretrial payments to plaintiffs against its own liability. The trial court made the following calculation:

| | |
|---|---|
| Total damages | $8,205,720.35 |
| Less payments from Shell | − $3,000,000.00 |
| Less payments from C & H | − $3,000,000.00 |
| Judgment damages for plaintiffs | $2,205,720.35 |
| C & H's percent of fault (50%) relative to the total for all defendants but Shell (85%) | × $^{50}/_{85}$ |
| Amount C & H must pay before entitled to contribution | $1,297,482.56 |

The court of appeals affirmed this calculation, holding that C & H's payments, like Shell's, were "settlements" to be credited against plaintiffs' total damages under section 33.012(b)(1). C & H contends that its payments to plaintiffs were not "settlements", since they did not absolve C & H of liability, but rather were "advances", in accordance with the agreement between C & H and plaintiffs. Thus, C & H argues, its payments should not have been credited to total damages, but to its own liability, in accordance with the following calculation:

| | |
|---|---|
| Total damages | $8,205,720.35 |
| Less payments from Shell | $3,000,000.00 |
| Balance after settlements | $5,205,720.35 |
| C & H's percent of fault (50%) relative to the total for all defendants but Shell (85%) | × $^{50}/_{85}$ |
| | $3,062,188.44 |
| Less payments from C & H | $3,000,000.00 |
| Amount C & H must pay before entitled to contribution | $62,188.44 |

Because the trial court's formula misapplied its payments, C & H argues, it is being denied contribution from other defendants for $1,235,294.12, the difference between $1,297,482.56 and $62,188.44. In effect, C & H complains, the trial court's formula allows Energy Coatings and Ecotech to share in the benefits of C & H's payments to plaintiffs by reducing their liability for contribution to C & H.

■ As previously noted, section 33.014(a) allows defendants to elect how payments received by a plaintiff who has "settled" with a person will be credited against plaintiff's recovery. One possible election under section 33.012(b)—and the one chosen by defendants in this case—is to reduce the damages recovered by plaintiffs by the amount of all "settlements". Neither "settled" nor "settlements" is specifically defined in the statute. However, section 33.011(5) does define "settling person" as "a person who at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability." This definition does not limit settling persons to those who have fully resolved all claims against them; rather, it includes those who settle only a part of their potential liability. This is consistent with the common understanding that a settlement can be full or partial. C & H paid money in consideration of potential liability. Under the statute, as well as in common parlance, it was a "settling person".

C & H argues that construing the statutory definition of "settling person" to include a person who settles only part of his liability creates anomalies in two other statutory provisions. Section 33.011(3) defines a "liable defendant" as "a defendant against whom a judgment can be entered for at least a portion of the damages awarded to the claimant." C & H argues that it makes no sense to treat the same defendant as both a "settling person" and a "liable defendant". We do not see the inconsistency. In fact, a party can easily be both settling (partially) and liable (partially), as C & H is in this case.

■ The other provision in which C & H argues an anomaly results is section 33.015(d), which states that "[n]o defendant has a right of contribution against any settling person." C & H argues that if "settling person" includes a party who has paid any amount at all to a plaintiff, the result would be that a party could avoid liability for contribution by paying plaintiff a small sum. The flaw in C & H's logic is that section 33.015(d) need not, and should not, be con-

strued to insulate a party who has settled part of his exposure to plaintiff from all liability for contribution. The better reading of section 33.015(d) is that a settling person is free from contribution only to the extent of the liability settled. This is consistent with the general rule that a person is not liable to a defendant for contribution if he is not also liable to the plaintiff. By our reading of section 33.015(d), no anomaly is caused by construing the definition of "settling person" to include persons who settle in part.

Finally, C & H argues that it is unfair and contrary to public policy to deny it the full benefit of its $3 million payment to plaintiffs in accordance with their settlement agreement. As it characterizes the circumstances, it attempted responsibly and timely to meet its obligations to plaintiffs while Energy Coatings and Ecotech made no such effort, yet its liability for contribution is the same as if it had done nothing. While we do not disagree with C & H, the remedy it seeks is beyond our power. The Legislature has set by statute the parameters of the right of contribution, and we cannot review the statute for fairness. Even if the Legislature were obliged to have a good reason for this aspect of the statutory scheme for contribution, we cannot say that it had none. It may have determined, for example, that partially settling defendants should not be favored with respect to their liability for contribution. Even if we disagreed with the Legislature, we could not review its determination.

■■■ Accordingly, we hold that "settlement", as used in the Comparative Responsibility Law, means money or anything of value paid or promised to a claimant in consideration of potential liability. Since C & H's payments fit this definition, we agree with the court of appeals that the trial court correctly credited the $3 million which C & H paid plaintiffs to the entire judgment. C & H's agreement with plaintiffs that its payments were advances rather than a settlement cannot affect the statutory contribution

rights of Ecotech and Energy Coatings, which were not parties to the agreement. The rights of C & H and plaintiffs, as between each other, are defined by their agreement; the other defendants' rights to contribution, however, are defined by statute.

### B

■■■ Ecotech argues that it is entitled to contribution from C & H. The lower courts rejected this argument on the ground that section 33.015(d) precludes contribution against a person who has settled any part of plaintiffs' claims against him. As we noted above, however, section 33.015(d) is not so broad; it insulates a person from contribution only to the extent the liability to the plaintiff has been settled. A defendant who settles only a part of a plaintiff's claim cannot be liable for contribution with respect to that part, but remains subject to contribution with respect to the part of plaintiff's claims that were not settled. C & H settled its liability to plaintiffs for damages in excess of $8.5 million, and for punitive damages. Contribution does not apply to punitive damages, section 33.002(a),[3] and plaintiffs did not recover more than $8.5 million. Accordingly, C & H's partial settlement does not insulate it from liability to Ecotech for contribution.

■■■ The trial court held C & H and Ecotech jointly and severally liable for all damages awarded plaintiffs, but incorrectly attributed $^{50}\!/\!_{85}$ of that responsibility to C & H and $^{30}\!/\!_{85}$ to Ecotech. The trial court appears to have reasoned that since the three defendants other than Shell were 85% responsible for plaintiffs' damages, their liability, as among themselves, should be apportioned 50 parts to C & H, 30 to Ecotech, and 5 to Energy Coatings. In apportioning liability between the jointly and severally liable defendants, however, Energy Coatings' percentage of responsibility is not considered.[4] Section 33.015(b) states:

> As among themselves, each of the defendants who is jointly and severally liable

---

**3.** "This chapter does not apply to a claim based on an intentional tort or a claim for exemplary damages included in an action to which this chapter otherwise applies."

**4.** Energy Coatings was found only 5% responsible by the jury, and therefore falls below the lowest applicable statutory threshold for joint and several liability. Tex.Civ.Prac. & Rem.Code § 33.013(c)(1).

under Section 33.013 is liable for the damages recoverable by the claimant under Section 33.012 in proportion to his respective percentage of responsibility. If a defendant who is jointly and severally liable pays a larger proportion of those damages than is required by his percentage of responsibility, that defendant has a right of contribution for the overpayment against each other defendant with whom he is jointly and severally liable under Section 33.013 to the extent that the other defendant has not paid the proportion of those damages required by that other defendant's percentage of responsibility.

By this provision, C & H is entitled to contribution from Ecotech to the extent that C & H pays more than 50/80ths of the total amount recoverable from both of them, and Ecotech is entitled to contribution from C & H to the extent that Ecotech pays more than 30/80ths of the total amount recoverable from both of them.

### C

■ C & H and Ecotech argue that the lower courts incorrectly held Energy Coatings liable to plaintiffs for only $\frac{5}{85}$ of the judgment of $2,205,720.35, or $129,748.26. C & H and Ecotech argue that Energy Coatings should be liable for 5% of plaintiffs' total damages of $8,205,720.35, or $410,286.02. C & H and Ecotech base their argument on section 33.013(a), which states:

> Except as provided in Subsections (b) and (c), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

Subsections (b) and (c) prescribe joint and several liability and are inapplicable to Energy Coatings since the jury found Energy Coatings to be only 5% at fault for plaintiffs' injuries. Under subsection (a), C & H and Ecotech argue, a defendant's liability is calculated by multiplying "the damages found by the trier of fact", rather than the damages actually recovered, by the defendant's percentage of responsibility.

We agree. Section 33.013(a) sets the liability to the claimant of each defendant at an amount equal to that defendant's percentage of responsibility multiplied by the damages found by the trier of fact. That calculation in this case would be as follows:

| | | |
|---|---|---|
| C & H: | 50% × $8,205,720.35 = | $4,102,860.17 |
| Ecotech: | 30% × $8,205,720.35 = | $2,461,716.11 |
| Energy Coatings: | 5% × $8,205,720.35 = | $410,286.02 |
| Total: | 85% × $8,205,720.35 = | $6,974,862.30 |

Subsections (b) and (c) provide: "Notwithstanding Subsection (a), each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under Section 33.012 with respect to a cause of action" in certain specified circumstances. As C & H and Ecotech both fall within these circumstances, they are "in addition" jointly and severally liable to plaintiffs for the damages recoverable under § 33.012, or $2,205,720.35, the $8,205,720.35 damages found by the jury less the $6 million paid in settlement. Plaintiffs can recover all their damages from C & H and Ecotech, or either of them, and can recover up to $410,286.02 from Energy Coatings. The maximum plaintiffs can recover from all defendants is the amount set by § 33.012.

The trial court's holding that Energy Coatings was liable to the plaintiffs for $\frac{5}{85}$ of the damages awarded in the judgment, rather than 5% of the damages found by the jury, is contrary to the plain language of § 33.013(a). However, the error affects only Energy Coatings' liability to the plaintiffs, and plaintiffs have not complained. Consequently, we *do not disturb the judgments of the lower courts which limit Energy Coatings' liability to plaintiffs to $\frac{5}{85}$ of the judgment.*

### D

C & H and Ecotech argue that they are entitled to contribution from Energy Coatings for 5% of the total damages plaintiffs were found to have incurred, rather than $\frac{5}{85}$ of the damages awarded in the judgment, as ordered by the trial court. This argument is based upon section 33.015(a), which states:

> If a defendant who is jointly and severally liable under Section 33.013 pays a percentage of the damages for which the de-

fendant is jointly and severally liable greater than his percentage of responsibility, that defendant has a right of contribution for the overpayment against each other liable defendant to the extent that the other liable defendant has not paid the percentage of the damages found by the trier of fact equal to that other defendant's percentage of responsibility.

According to C & H and Ecotech, if C & H pays plaintiffs more than 50% of the $2,205,720.35 damages for which it is jointly liable ($1,102,860.18), or Ecotech pays plaintiffs more than 30% of those damages ($661,716.11), they are entitled to contribution for the overpayment against Energy Coatings to the extent the latter has paid less than 5% of the $8,205,720.35 damages found by the trier of fact ($410,286.02). In other words, C & H and Ecotech argue that they should not be required to pay more than their percentage of the judgment until Energy Coatings has paid its percentage of the verdict. Energy Coatings would thus be liable for about 19% of the judgment ($410,286.02/$2,205,720.35), nearly four times its percentage of responsibility. If C & H paid the entire remaining 81% of the judgment and Ecotech paid nothing, C & H would pay only about four times as much as Energy Coatings, even though its percentage of responsibility was ten times as great.

C & H and Ecotech's argument ignores § 33.013(a), which, as explained above, sets the individual or several liability of each liable defendant as its percentage of responsibility multiplied by the damages found by the trier of fact, irrespective of whether that defendant is subject "in addition" to joint liability under § 33.013(b) and (c). The amount for which a defendant is jointly liable, which is the maximum a claimant can recover under § 33.012(a), may be less than the several liability calculated under § 33.013(a) if, as in this case, settlements have been credited against the damages found by the trier of fact. Section 33.015(a) entitles a jointly and severally liable defendant to contribution only when he has paid a larger share of the damages for which he is jointly—and severally—liable than his percentage of responsibility. We believe that § 33.015(a) refers to § 33.013(a) as well as § 33.013(b) and (c). This literal reading of § 33.015(a) avoids the consequences of C & H and Ecotech's argument, which would require a minimally liable defendant to bear part of the burden of a jointly liable defendant in circumstances like those of this case. Even assuming that C & H and Ecotech's argument is an equally plausible reading of the statute, the reasonable alternative which avoids unjust consequences is preferable.[5]

We therefore conclude that C & H and Ecotech are entitled to contribution from Energy Coatings only to the extent that they overpay their respective liability under § 33.013(a).[6] This, of course, does not affect C & H's and Ecotech's rights to contribution as between themselves, which we have discussed above.

### III

C & H and Ecotech argue that there is no evidence to support the jury's finding that plaintiffs' loss of inheritance was $200,000. They acknowledge that plaintiffs presented evidence of Jerry Thompson's projected earnings and personal expenditures over his expected lifetime, and attempted to calculate from this evidence the present value of his lost earning capacity. However, C & H and Ecotech contend that plaintiffs offered no evidence of what Thompson would reasonably have expended in support of his family. Without evidence of what Thompson's total expenditures would have been over his expected lifetime, C & H and Ecotech argue that it is impossible to infer how much of his projected earnings would have remained in his estate at his death. Plaintiffs do not contend that there is evidence of what

---

5. Statutory provisions will not be so construed or interpreted as to lead to absurd conclusions, great public inconvenience, or unjust discrimination, if the provision is subject to another, more reasonable construction or interpretation. *See Cramer v. Sheppard*, 140 Tex. 271, 167 S.W.2d 147, 155 (1942).

6. None of the parties have raised an issue of the effect of § 33.016 on our analysis, and we intimate no view on that subject.

Thompson would have expended in support of his family; instead, they contend that such evidence is unnecessary. Plaintiffs make two arguments in support of this contention.

First, plaintiffs argue that the jury could determine the value of what Thompson's estate would have been from the evidence that was introduced. As plaintiffs summarize the evidence, it is that Thompson had a close and loving relationship with his family; that he was well educated, a hard worker, a certified public accountant, and vice president of an iron works company; that he made a good salary which had generally increased over time; and that he did not spend money on himself, was very conservative with money, and had accumulated some savings. None of this evidence indicates that Thompson's estate would probably have been $200,000, the amount found by the jury, or $2. One cannot even guess from the fact that Thompson had set aside some savings whether he would have spent them on his children's college education or other family expenses.

Second, plaintiffs argue that damages for loss of inheritance were awarded in *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630 (Tex. 1986), and *Lopez v. City Towing Assoc., Inc.*, 754 S.W.2d 254 (Tex.App.—San Antonio 1988, writ denied), on no more evidence than there is in the present case. In *Yowell*, we summarized the evidence as follows:

> The plaintiffs introduced evidence as to each of the decedents' salaries, expected raises, expected promotions and salary increases, earning capacities, enforced savings through pension plans, *spending habits*, age, health, and relationship with the wrongful death beneficiaries. The plaintiffs also produced evidence of the age and health of the wrongful death beneficiaries.

703 S.W.2d at 634 (emphasis added). Although this summary is abbreviated, it indicates that there was evidence in *Yowell* which is not present in this case, *viz.*, the decedent's "spending habits." There is no question that this evidence was present in *Lopez*. The court of appeals stated: "There was testimony that Mrs. Lopez' earnings were not used to support the family, but were used to provide extra things for the family, primarily for the children." 754

S.W.2d at 265. Thus, neither *Yowell* nor *Lopez* supports plaintiffs' argument.

In *Yowell* the Court stated:

> We define loss of inheritance damages in Texas as the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful death causing the premature death. True, not every wrongful death beneficiary sustains loss of inheritance damages. *If the decedent would have earned no more than he and his family would have used for support,* or if the decedent would have outlived the wrongful death beneficiary, *loss of inheritance damages would properly be denied.* This is for the jury to decide.

703 S.W.2d at 633 (emphasis added). It is precisely the element referred to in *Yowell*—what the decedent would have spent to support his family—that is missing here. Assigning the jury responsibility for determining what damages should be assessed does not cure this deficit. The jury's award must be based upon evidence.

The argument that loss of inheritance damages are inherently too speculative and should never be awarded, although rejected in *Yowell*, has not been disproved. The present case illustrates again the vagaries inherent in proving what someone would have inherited—whether he or she would have been among the decedent's beneficiaries, whether ordinary family expenses would have consumed all the decedent's income, whether the ordinary circumstances of life would have exhausted any estate. Questions like these are virtually imponderable in most cases. It is no answer that other types of damages are also indeterminate; the willingness of the law to accommodate some indeterminacy in assessing damages does not mean there are no limits. Hard as it is to prove what a person's net earnings would be over an expected lifetime, it is harder still to prove what would have accumulated by life's end, and who would receive it.

The parties have not argued that we should revisit *Yowell*, and we do not do so. Yet if loss of inheritance damages are to

be awarded, there must be evidence that plaintiffs would probably have been the beneficiaries of decedent's estate, and evidence from which the amount of that estate can reasonably be calculated. The necessity of some calculation is indicated by the fact that loss of inheritance damages are economic in nature, and by the requirement in *Yowell* that only the *present value* of the amount of an estate be awarded. Present value is not simply a judgment call by the jury but a mathematical calculation. Thus, loss of inheritance damages must be determined as other economic damages are, rather than as damages for mental anguish.

There is no evidence in the record before us from which anyone could put a dollar figure on Thompson's likely estate, much less the present value of it. We therefore conclude that there is no evidence to support the jury's finding for loss of inheritance damages.

## IV

■■■ We next consider whether Tex.Rev. Civ.Stat.Ann. art. 5069–1.05, § 6(a), passed in 1987, modified *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985), so as to allow prejudgment interest on future damages. We conclude that it did.

## A

In *Cavnar*, this Court held that in tort actions for unliquidated damages, prejudgment interest was recoverable under "general principles of equity" on "damages *that have accrued by the time of judgment.*" *Id.* at 552, 554 (emphasis in original). The Court explained: "[A] plaintiff is not entitled to recover prejudgment interest on damages until those damages have actually been sustained," because "[u]ntil that time, the plaintiff has not lost the use of the money he ultimately receives from the defendant." *Id.* at 554–55. Indeed, discounting future damages to present value as of the date of trial rather than the date of the incident effectively builds prejudgment interest into damage awards. *Id.* at 555 n. 5.

Like the present case, *Cavnar* was a wrongful death and survival action in which the plaintiffs did not tender questions segre-

gating past and future losses. The Court concluded there that the plaintiffs could recover prejudgment interest only on the pecuniary and nonpecuniary damages sustained by the decedent prior to her death, but not on damages for their own undifferentiated past and future losses. *Id.* at 556.

In 1987, however, the Legislature provided for prejudgment interest by statute. Tex. Rev.Civ.Stat.Ann. art. 5069–1.05, § 6(a) (Vernon Supp.1993), applicable to all suits commenced on or after September 2, 1987, states in full:

> Judgments in wrongful death, personal injury, and property damage cases must include prejudgment interest. Except as provided by Subsections (b), (c), and (d) of this section, prejudgment interest accrues on *the amount of the judgment* during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered.

(Emphasis added.) The court of appeals held that this provision entitled the Thompsons to prejudgment interest on the entire judgment, since the statute "makes no distinction between damages awarded in the judgment for past damages and damages awarded for future damages." 810 S.W.2d at 276. We agree.

## B

### 1

This holding of the court of appeals, far from being an aberration, is consistent with the holdings of several other appellate courts, *see Ellis County State Bank v. Keever*, 870 S.W.2d 63 (Tex.App.—Dallas 1992), *rev'd in part on other grounds*, 888 S.W.2d 790 (Tex.1994); *Wal–Mart Stores, Inc. v. Berry*, 833 S.W.2d 587, 596–97 (Tex.App.—Texarkana 1992, writ denied); *Hughes v. Thrash*, 832 S.W.2d 779, 787 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Sisters of Charity of the Incarnate Word v. Dunsmoor*, 832 S.W.2d 112, 115–16 (Tex.App.—Austin 1992, writ denied); *C.T.W. v. B.C.G.*, 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991,

no writ), and the writings of respected commentators and analysts. *See* John Montford & Will Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System*, 25 Hous.L.Rev. 59, 102–03 (1988); 3 State Bar of Texas, Texas Pattern Jury Charges PJC 81.02 comment (1990). We conclude that these authorities are correct.

Although permitting the award of "interest" on future damages does sacrifice a certain purity of meaning, as Justice Hecht makes clear in his dissent, the real question is whether the Legislature also indulged in this imprecise usage. Here Justice Hecht is less convincing. The structure of section 6 as a whole suggests to us that the Legislature did not use "interest" in such a logical, legalistic way. Subsections (b) and (c), for instance, suspend accrual of prejudgment interest during the period in which a settlement offer may be accepted. This is not merely an effort to arrive at an accurate measure of compensation for the plaintiff's loss of use of money, since a plaintiff who declines a settlement offer has been without the use of the money just as surely as one who received no offer. Rather, these subsections have the effect and evident purpose of modifying plaintiffs' and defendants' behavior to encourage settlement.

By providing in subsection (c) that "prejudgment interest does not include" interest on the offer amount during the period the offer is open, the Legislature manipulated the concept of "prejudgment interest" to encompass settlement incentives. Just as interest was not used solely for fair compensation in subsection (c), it was also employed more expansively in subsection (a).

---

2

In his dissent, Justice Hecht counters that our construction of section 6(a) would compel the award of prejudgment interest on punitive damages, DTPA "statutory damages," and costs and attorney's fees. We disagree in part.

Prejudgment interest on punitive damages is expressly forbidden by statute for personal injury, property damage and wrongful death actions grounded in negligence or strict tort liability. Tex.Civ.Prac. & Rem.Code § 41.006 (Vernon Supp.1993). Our reading of section 6(a) would not overrule the express language of section 41.006, as both provisions were part of the same tort reform package. *See* Montford & Barber, *supra* at 114.[7] Under Justice Hecht's interpretation of section 6(a), section 41.006 would be superfluous legislation, as prejudgment interest would already be unavailable on *any* punitive award.

Moreover, we disagree that our approach would allow prejudgment interest on costs and attorney's fees. These awards cannot fairly be considered a part of the "amount of the judgment." In providing for postjudgment interest in the very article at issue, the Legislature separated "costs" from "judgment." *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.05, § 2 (Vernon Supp.1993) ("all judgments, together with taxable court costs" earn postjudgment interest). This division corresponds with common usage in the legal world. *See, e.g., Garcia v. Arbor Green Owners Association, Inc.*, 838 S.W.2d 800, 801 (Tex.App.—Houston [1st Dist.] 1992, writ denied) ("judgment in the amount of $2,199.25, plus attorney's fees of $8,500, plus interest and costs"); *Hayden v. American Honda Motor Co.*, 835 S.W.2d 656, 658 (Tex. App.—Tyler 1992, no writ) ("judgment against Appellants in the amount of $43,-

---

7. In our original opinion in this cause, we left open the possibility that punitive damages might earn prejudgment interest in cases not covered by *section 41.006:*

> Perhaps prejudgment interest would be available on punitive awards not covered by Tex.Civ. Prac. & Rem.Code § 41.006, including treble damage awards under the Texas Deceptive Trade Practices and Consumer Protection Act, Tex.Bus. & Com.Code § 17.41, *et seq.* This result would be consistent with the legislative purpose of encouraging settlements. As the

issue of prejudgment interest on punitive damages outside the statute is not before the Court today, however, we do not reach this question. 37 Tex.Sup.Ct.J. 149, 161 n. 1 (November 24, 1993). The Court resolves this question today in *Ellis County State Bank v. Keever*, 888 S.W.2d 790 (Tex.1994), holding that section 41.006 is not limited to those actions expressly referred to in section 41.002(a), but rather "preclude[s] an award of prejudgment interest on punitive damages that might otherwise be required by § 6(a)." 888 S.W.2d at 798.

151.27, plus interest and costs"); *Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.*, 836 S.W.2d 726, 731 (Tex.App.—Dallas 1992, writ denied) ("judgment for unjust enrichment in the amount of $15,100, plus reasonable and necessary attorneys' fees in the amount of $109,000"); *Gullo–Haas Toyota, Inc. v. Davidson, Eagleson and Co.*, 832 S.W.2d 418, 419 (Tex.App.—Houston [1st Dist.] 1992, no writ) ("the joint bond must secure the full amount of the judgment, plus interest and costs"); *International Piping Systems v. M.M. White & Associates, Inc.*, 831 S.W.2d 444, 446 (Tex.App.—Houston [14th Dist.] 1992, writ denied) ("judgment in favor of appellees in the amount of $215,-376.73 for breach of contract, plus attorney's fees, prejudgment and postjudgment interest, and costs of court").

## C

C & H and Ecotech also claim that if section 6(a) does modify *Cavnar*, it deprives them of their property without due course or due process of law and violates their right to trial by jury. TEX. CONST. art. I, §§ 15, 19, 29; U.S. CONST. amend. V, XIV. We disagree.

### 1

The substantive components of due course and due process of law demand a balancing of the gain to public welfare from a statute with the effect on personal property or liberty. Unless fundamental rights are implicated, however, the statute need only be rationally related to a legitimate legislative purpose. *See Moore v. City of East Cleveland*, 431 U.S. 494, 498–99 & n. 6, 97 S.Ct. 1932, 1934–36 & n. 6, 52 L.Ed.2d 531 (1977); *Thompson v. Calvert*, 489 S.W.2d 95, 99 (Tex. 1972); *Pedraza v. Tibbs*, 826 S.W.2d 695, 697–98 (Tex.App.—Houston [14th Dist.] 1992, writ dism'd w.o.j.). We conclude that section 6(a) meets the rational relation test.

Fully compensating the plaintiff is not the only goal of prejudgment interest awards; they also serve the separate purpose of expediting settlements and trials. *Cavnar*, 696 S.W.2d at 554. A legislative decision that interest on the full judgment promotes the latter objective is not so unreasonable or oppressive as to be unconstitutional, particularly when considered in conjunction with the Legislature's other 1987 modifications of the law regarding prejudgment interest. Although in *Cavnar* we decided that as a matter of administrative convenience interest should begin to accrue on both pecuniary and nonpecuniary damages six months after the date of the incident, 696 S.W.2d at 555, the Legislature now provides that interest begins to accrue on the earlier of (a) the 180th day after the defendant receives written notice of the claim, or (b) the day the suit is filed. TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(a) (Vernon Supp.1993). In many cases, the accrual date will be postponed beyond that which would have been set by *Cavnar*. Moreover, as discussed above, the Legislature reduced the amount of recoverable prejudgment interest under *Cavnar* by providing that prejudgment interest does not include interest for periods during which a settlement offer from the defendant was open for acceptance, except interest on any portion of the judgment that exceeds the amount of the offer. *Id.* § 6(b), (c).[8] Finally, the 1987 amendments gave trial courts discretion to toll the accrual of prejudgment interest in response to a plaintiff's delay. *Id.* § 6(d).[9]

Thus, in various respects the Legislature reduced the "full compensation" prejudgment interest recoverable under *Cavnar*, while correspondingly increasing it by the inclusion of future damages. Although in isolation the Court's reading of section 6(a) may appear to overcompensate a plaintiff, it also contributes to the system of rewards and penalties introduced by the 1987 enactment. As Montford and Barber explain:

---

**8.** *See Lyons v. Ayala*, 723 S.W.2d 254, 258 (Tex. App.—Fort Worth 1986, no writ) (holding that *Cavnar* does not permit equitable modifications such as halting accrual of prejudgment interest once a settlement offer in excess of the ultimate jury verdict has been made).

**9.** *See Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex.1986) (per curiam) (holding that *Cavnar* does not give the trial court discretion to reduce prejudgment interest in response to dilatory tactics by the plaintiff).

From a tort reform policy perspective section 6(a) is a trade-off provision. Shortening of the accrual period promotes the policies of the tort reform laws, while applicability to future damages does not. Whether, in comparison to *Cavnar*, more or less prejudgment interest is recoverable under section 6(a) and the other provisions of section 6 hereinafter discussed will depend on the facts and circumstances of each case.

25 HOUS.L.REV. at 104. In operation, it would penalize only a defendant who is adjudged to be a tortfeasor and who did not make an adequate and timely offer of settlement to the plaintiff.

Such a scheme to encourage settlement does not exceed the Legislature's authority. In *Pennington v. Singleton*, 606 S.W.2d 682 (Tex.1980), we upheld against a due process challenge the mandatory treble damage provision of the Deceptive Trade Practices Act as a reasonable penalty, noting that fines exceed the "wide latitude of discretion" given states under the Due Process Clause only when they are " 'so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.' " *Id.* at 690 (quoting *St. Louis, Iron Mountain & Southern Ry. Co. v. Williams*, 251 U.S. 63, 67, 40 S.Ct. 71, 73, 64 L.Ed. 139 (1919)). The adjustment of prejudgment interest enacted under section 6(a) is merely a less onerous fine.

### 2

The right of trial by jury secured by TEX. CONST. art. I, § 15 has never been construed by this Court to prohibit all legislative activity affecting jury awards. Such a rule would foreclose other modifications that this Court has upheld against constitutional challenge, such as treble damages under the Texas Deceptive Trade Practices and Consumer Protection Act and caps on medical malpractice damages in statutory wrongful death actions. *See Pennington, supra; Rose v. Doctors Hospital*, 801 S.W.2d 841 (Tex.1990); *Union Central Life Ins. Co. v. Chowning*, 86 Tex. 654, 26 S.W. 982, 984 (1894). We do not read the jury trial provision to prohibit this modification.

For these reasons, we affirm that portion of the judgment of the court of appeals upholding the trial court's award of prejudgment interest on future damages.

### V

Finally, we examine the parties' remaining arguments concerning how the calculation of prejudgment interest should be made.

The court of appeals construed the statutory requirement that prejudgment interest accrue "on the judgment" to mean also that the applicable "principal" is the amount awarded by the judgment, not the damages found by the jury. 810 S.W.2d at 275. We agree that the trial court erred by calculating prejudgment interest using a "declining principal" formula based upon the total damages found in the case with settlement payments and offers credited periodically.

Plaintiffs complain that the trial court should have accrued prejudgment interest from the date suit was filed, rather than 180 days later. Section 6(a) provides for prejudgment interest "during the period beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first." The first of these two events to occur in this case was the filing of suit. Accordingly, prejudgment interest should be calculated from November 20, 1987, not May 18, 1988.

Finally, the trial court calculated interest through the date of judgment. Section 6(a) provides that prejudgment interest accrues only over a period "ending on the day preceding the date judgment is rendered."

On remand the trial court should make these changes in its calculations.

### VI

In sum, we hold that:

● plaintiffs are entitled to prejudgment interest on the entire amount of the judgment, including future damages, reduced by the amounts of the unaccepted settlement offers for the periods those offers were outstanding, to accrue at the rate of 10% per annum from November

20, 1987, to the day before judgment is rendered;

● C & H is entitled to contribution from Ecotech to the extent that C & H pays more than 50/80ths of the total amount recoverable from C & H and Ecotech;

● Ecotech is entitled to contribution from C & H to the extent that Ecotech pays more than 30/80ths of the total amount recoverable from C & H and Ecotech;

● C & H is not entitled to contribution from Energy Coatings;

● Ecotech is not entitled to contribution from Energy Coatings; and

● there is no evidence to support an award of loss of inheritance damages.

The judgment of the court of appeals is reversed and the case is remanded to the trial court for rendition of judgment in accordance with this opinion.

HECHT, Justice, joined by GONZALEZ, CORNYN and ENOCH, Justices, concurring and dissenting.

My prior opinion is withdrawn and the following substituted.

I join in the Court's analysis of the Comparative Responsibility Law, but I do not agree that prejudgment interest should be awarded on future damages. Accordingly, I concur in Parts I, II, III and V of the Court's opinion, but dissent from Part IV.

At trial plaintiffs claimed damages which they had suffered in the past as well as those which they were reasonably likely to suffer in the future. There was evidence of both past and future damages, and the jury was asked to consider both in its findings. The jury was not asked to, and did not, segregate past from future damages. Four of the jury's findings—plaintiffs' pecuniary loss, loss of companionship and society, mental anguish, and loss of inheritance—may therefore have included both past and future damages together. The only damages incurred entirely in the past were Thompson's own pain and suffering prior to his death on the day of the accident, and his funeral expenses.

The trial court awarded prejudgment interest on all damages, not just past damages. Plaintiffs contend that prejudgment interest on future damages is authorized by TEX.REV. CIV.STAT.ANN. art. 5069–1.05, § 6(a) (Vernon Supp.1994), which calls for prejudgment interest to accrue "on the amount of the judgment". Because judgments include all damages awarded, whether past or future, and the statute does not differentiate between the two, plaintiffs argue, and the court of appeals held, that the statute authorizes interest on both. The court of appeals adhered to this view in a later case, *Hughes v. Thrash*, 832 S.W.2d 779, 787 (Tex.App.—Houston [1st Dist.] 1992, no writ). Four other courts of appeals have adopted the same construction of section 6(a). *Wal–Mart Stores, Inc. v. Berry*, 833 S.W.2d 587, 596–97 (Tex.App.—Texarkana 1992, writ denied); *Sisters of Charity v. Dunsmoor*, 832 S.W.2d 112, 115–16 (Tex.App.—Austin 1992, writ denied); *Ellis County State Bank v. Keever*, 870 S.W.2d 63 (Tex.App.—Dallas 1992), *aff'd in part and rev'd in part*, 888 S.W.2d 790 (Tex.1994); *C.T.W. v. B.C.G.*, 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991, no writ). *See also* John T. Montford & Will G. Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System (pt. 1)*, 25 HOUS.L.REV. 59, 102–03 (1988); 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 81.02 cmt. (1990).

Two principal arguments are offered in support of this construction of the statute. One is that this construction has been endorsed by the Senate sponsor of the statute in a law review article published since the statute was enacted. Montford & Barber, *supra*. While the perspectives of individual legislators on the meaning of statutes may be instructive, they do not govern the construction of the statute. We are obliged to effectuate the intent of the Legislature and not merely that of some of its members. It is not unusual for intentions concerning particular legislation to vary among its supporters. We must assume that the Legislature has done its very best to express its intent in the words of the statute itself. Even when those words leave us in such doubt as to the Legislature's purpose that we must look beyond the provision for assistance, it is ordinarily inappropriate to consider the views of individual legislators. *See, e.g., Commissioners'*

*Court of El Paso County v. El Paso County Sheriff's Deputies Ass'n,* 620 S.W.2d 900, 902 (Tex.Civ.App.—El Paso 1981, writ ref'd n.r.e.). Moreover, courts construing statutory language should give little weight to post-enactment statements by legislators. *See, e.g., Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 352–53, 42 L.Ed.2d 320 (1974); *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 639 n. 34, 87 S.Ct. 1250, 1265 n. 34, 18 L.Ed.2d 357 (1967); *American Fed'n of Gov't Employees Locals 225, 1504 & 3723 v. Federal Labor Relations Auth.,* 712 F.2d 640, 647 n. 29 (D.C.Cir.1983). Explanations produced, after the fact, by individual legislators are not statutory history, and can provide little guidance as to what the legislature collectively intended. *See Rogers v. Frito–Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.) (what happened after a statute was enacted may be history and it may come from members of the Congress, but it is not part of the legislative history of the original enactment), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980).

My sense is that the Court relies heavily upon Senator Montford's view of the statute, although it never squarely says so. Had Senator Montford espoused the opposite view, I doubt very seriously whether the Court would take the same position it does today. As the Court concedes, awarding interest on money not yet owed is not logical, linguistically or legally. All things being equal, I would hope that the Court would presume legislators to be more logical rather than less. But all things are not equal here, and that is principally because Senator Montford has indicated that participants in the drafting of the statute intended for interest to be paid on future damages. Senator Montford certainly occupied a singular role in the drafting and passage of the legislation before us. Yet it is not his intent which controls construction of the statute, but the intent of the entire Legislature. The purposes of a few Members cannot be imputed to the Legislature. That Body binds by what it says, in the English language. If the Court were as willing in every case as it is in this one to construe a statute to mean what some of its sponsors hoped it would, rather than what a person of common sense would think from reading it, it would have adopted a bad rule indeed. As it is, I suspect that the Court's attitude today will not be applied in other cases consistently.

The other argument made in support of plaintiffs' construction of section 6(a) is that it is dictated by a literal reading of the statutory language. In actuality, however, this construction of the statute reads only the phrase "on the judgment" literally; it does not read the word "interest" literally. Interest is not merely a right to some unspecified type of compensation. While "interest" may sometimes be considered "damages" and sometimes as purely "interest", in both contexts, "interest" serves to compensate for the loss of use of money. The Legislature has defined interest as "the compensation allowed by law for the use or forbearance or detention of money". Tex.Rev.Civ.Stat.Ann. art. 5069–1.01(a) (Vernon 1987). In *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985), this Court wrote:

> Interest as interest is compensation allowed by law or fixed by the parties for the use or detention of money. Interest as damages is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of the judgment.

*Id.* (citations omitted).

Even if the Legislature were to decide that there should be some compensation awarded for not paying an amount which is not yet due—a fairly strange supposition in itself—that compensation could not be called "interest", if we are to be true to the literal meaning of the word, any more than it could be called "alimony". One might as well call such a surcharge on future damages prejudgment alimony as prejudgment interest; both would be non sequiturs. To read "on the judgment" as literally as plaintiffs do, one cannot read "interest" literally at all.

In a model of understatement, the Court concedes that "permitting the award of 'interest' on future damages does sacrifice a certain purity of meaning". *Ante* at 324. "Crucifies language" might not be too over-

stated. The sole justification the Court offers for its "sacrifice" is that the statute suspends accrual of prejudgment interest while a settlement offer is outstanding, thus indicating that it is concerned not only with fair compensation but with settlement incentives. Here the Court's analysis falters. This argument, even if valid, does not suggest, let alone prove, that the Legislature's concerns with settlement in one part of the statute carried over to other parts. In essence, the Court argues that since the Legislature was sometimes concerned with settlement incentives, it always was, regardless of the language used. The fallacy of this argument is obvious.

It is true that the Legislature *could* have both misused the word "interest" and even had a reason for doing so. Absent some rather plain indication of such strange behavior, however, the Court's reading of the statute is not very plausible. I should think there would be very few lawyers, and even fewer non-lawyers, who would not be startled by the idea that interest can accrue on money that has never been advanced and is not yet due.

Plaintiffs' and the Court's construction of section 6(a) also carries unique consequences. Besides past and future damages, judgments may include costs and attorney fees, including attorney fees in the event appeals are taken. In plaintiffs' view, section 6(a) would impose prejudgment interest on attorney fees that might never even be incurred. Judgments also include prejudgment interest. If "on the judgment" requires awarding prejudgment interest on every amount included in a judgment, prejudgment interest must be awarded on the prejudgment interest included in the judgment. It is implausible the Legislature intended section 6(a) to operate in this fashion.[1]

To award "interest"—if that is what we were required to call a surcharge on all damages awarded in a judgment—on future damages would overcompensate plaintiffs. In this case, the jury was asked a standard

damages question: "What sum of money, if paid now in cash, would fairly and reasonably compensate [plaintiff] for her damages, if any ...?" In determining an amount for future damages, the jury was asked for the present value of those damages, that is, the amount which, if paid immediately in cash, would equal the amounts of damages as incurred in the future. Plaintiffs' evidence attempted to establish the present value of the future damages they claimed. To add prejudgment "interest" to the figure awards more than the damages actually suffered. As we explained in *Cavnar*:

> A problem of overcompensation arises if the plaintiff can collect prejudgment interest on future damages discounted to present value as of the date of trial. If the trier of fact discounts future damages to the date of the incident, then an interest factor should be used to convert the damages from a date-of-incident value to a date-of-trial value. A more direct way to achieve the same result is to discount future damages only to the date of trial. No interest factor is then necessary for the future damages since the present value calculation expresses those damages in date-of-trial dollars. It thus becomes apparent that prejudgment interest on future damages evaluated as of the trial date would result in overcompensation to the plaintiff.

696 S.W.2d at 555 n. 5. *See also Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 636 (Tex.1986) ("Prejudgment interest is not recoverable for unaccrued damages such as loss of inheritance."). It is possible, of course, that the Legislature simply rejected *Cavnar's* conclusions and decided to overcompensate plaintiffs. Assuming that the Legislature could provide for such overcompensation as a means of accomplishing some legitimate legislative goal, we do not think that it would have taken so extraordinary a step without making its intent very clear.

---

1. Montford and Barber in fact reject a "literal" approach in addressing whether the "judgment" includes prejudgment interest, and so prejudgment interest on prejudgment interest. They reason that construing "judgment" as including prejudgment interest would result in "compounding" of interest, which in turn would conflict with the statutory provision for simple interest and its "legislative intent". Montford & Barber, 25 HOUSTON L.REV. at 106–07 n. 24.

A similar overcompensation problem exists with statutory and punitive damages, which may also be included in a judgment. In *Cavnar* we explained the reasons for not charging prejudgment interest on such damages:

> Commentators are virtually unanimous in advocating that prejudgment interest not be awarded on future damages and punitive damages.
>
> Punitive damages are intended to punish the defendant and to set an example to others. They are assessed over and above the amount of damages necessary to indemnify the plaintiff. The plaintiff can thus be made whole even if prejudgment interest is not awarded on punitive damages. The plaintiff is likewise unharmed by the defendant's retention of future damages prior to trial since these damages are, by their very nature, unaccrued.

696 S.W.2d at 555–556 (citations omitted). The Court rejects the thought that prejudgment interest could be awarded on punitive damages, based upon a separate statute, TEX. CIV.PRAC. & REM.CODE § 41.006. *Ellis County State Bank v. Keever*, 888 S.W.2d 790 (Tex.1994). I agree that section 41.006 and section 1.05 should be read consistently, but to do so supports the construction of section 1.05 that does not award prejudgment interest on future damages. The difficulty in the Court's position is that it must concede that even though prejudgment interest is expressly prohibited on punitive damages, it may be allowed on statutory damages which have the same purpose.

It is possible to avoid all these problems and give effect to both the phrase "on the judgment" and the word "interest" by construing section 6(a) to authorize prejudgment interest on judgment amounts whenever interest—as that word has been defined by the Legislature and by this Court, and as it has always been understood—can be applied. "Interest" would apply only to past damages and not to future, statutory or punitive damages; it would apply to attorney fees only to the extent they were incurred prior to judgment. The statute entitles plaintiffs in wrongful death, personal injury and property damage cases to prejudgment interest on any sum in the judgment which can bear interest during the period over which it accrues, that is, on any loss which existed prior to judgment. This construction compensates plaintiffs fully for their losses, without overcompensating them and without penalizing defendants for nothing more than awaiting trial.

Consequently, I would hold that plaintiffs are not entitled to prejudgment interest on future damages. Plaintiffs, having failed to request that the jury be instructed to segregate their findings on past and future losses, should not be entitled to recover prejudgment interest on amounts which may have included future damages. *Cavnar*, 696 S.W.2d at 556. Prejudgment interest should be awarded only on the $1 million awarded for Thompson's pain and suffering, and the funeral expenses, after the settlement credit is applied pro tanto to those amounts. Since these damages are 14.69% of the total plaintiffs incurred, they should be reduced by that same percentage of the $6 million credit before prejudgment interest is calculated.

C & H and Ecotech contend that prejudgment interest on future damages is also prohibited by the Fifth and Fourteenth Amendments to the United States Constitution and by article I, sections 15, 19 and 29 of the Texas Constitution. In view of my construction of section 6(a), I need not reach these arguments.

I would reverse the lower courts' award of prejudgment interest on unsegregated past and future damages. Accordingly, I dissent.

DOGGETT, Justice, joined by GAMMAGE, Justice, dissenting and concurring.

My opinion of November 24, 1993 is withdrawn and the following is substituted. This new opinion is necessitated by the formal merger of the previous peculiar twin majority opinions of Chief Justice Phillips and Justice Hecht, *compare Casso v. Brand*, 776 S.W.2d 551, 565 (Tex.1989) (Chief Justice Phillips dissenting to his own majority opinion), and by the majority's abandonment of its previous rationale regarding the contribution due from Energy Coatings. *Compare* 37 Tex.Sup.Ct.J. 162, 167 (Nov. 24, 1993) (Doggett, J., concurring & dissenting).

Today's extended observations address significant, complex issues on which the litigants have not fully spoken. The parties limited their argument to the prejudgment interest issue on which writ was granted, and only the defendants even briefed the issue on comparative responsibility about which today's majority now says so much. *See generally Fikes v. Ports*, 373 S.W.2d 806, 808 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.) ("Our judicial system rests upon the foundation of an adversary presentation, which affords a theoretical guarantee that the diligent antagonists, by developing all aspects of the dispute, will prevent the court from being misled by inadequate understanding of the facts and law, into a position unjust to the parties before it and possibly damaging to the community"); *compare Diamond Shamrock Refining & Marketing Co. v. Mendez*, 844 S.W.2d 198, 200, 201 (Tex.1992) (majority declines decision of issue on grounds that "it has not been adequately presented by the parties[ and i]t would illserve the State's jurisprudence to decide [it] on such a sparse record.").

## I. Loss of Inheritance Damages

The majority today rewrites our state's decisional law regarding loss of inheritance damages. After making a thorough review of decisions in other jurisdictions, leading commentators, and federal statutory provisions, this Court concluded in *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630 (Tex.1986), that allowing recovery for loss of inheritance was necessary to ensure justice for the family members of some victims of wrongful death.[1] We defined loss of inheritance damages as

the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death.

*Id.* at 633. The minority view that such damages are simply "too speculative" was expressly rejected:

Though probably nothing is more certain than the uncertainty of human life, presuming that thrifty persons will accumulate an estate and leave it to their heirs at death is no more speculative than finding any of the other recognized elements of pecuniary loss in a wrongful death action, such as lost support, guidance, and training. "Statutes giving damages for injuries resulting in death necessarily deal with probabilities," and necessarily indeterminate damages are properly left to the sound determination of the jury. *San Antoni[o] A.P. Ry. Co. v. Long*, 87 Tex. 148, 27 S.W. 113, 117, 118 (1894).

*Id.*

Under the guise of "no evidence" review, the majority has today once again rejected that "sound determination of the jury." *Id.* In determining a "no evidence" point, a reviewing court "must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences." *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *see also State v. $11,014.00*, 820 S.W.2d 783 (Tex.1991) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If more than a scintilla of such evidence exists, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence.

The court of appeals here had no difficulty applying that well established standard and concluding that there is obviously some evidence to support the jury finding that Linda Thompson, the widow, suffered $200,000 in damages for loss of inheritance. 810 S.W.2d 259, 270–71. This evidence established the current salary and reasonably expected increases for Jerry Thompson, a certified public accountant and vice president of Sunbelt Ironworks, Inc. Testimony further addressed his very conservative spending hab-

---

**1.** By the time of our decision in *Yowell*, "loss of inheritance damages ha[d] long been recognized as recoverable in death cases." 1 STUART M. SPEISER, RECOVERY FOR WRONGFUL DEATH § 3:39, at 278 (2d ed. 1975) (citing TIFFANY, DEATH BY WRONGFUL ACT 378 (2d ed. 1913) and McCORMICK, DAMAGES 350 (1935)).

its, accumulation of savings, retirement plans, age, health, and relationship with the wrongful death beneficiaries, as well as the age and health of the latter.

In addition to lay witnesses on these subjects, Dr. John William Allen, a professor of economics at Texas A & M University,

> testified as to the value of Jerry Thompson's earning capacity, made a deduction for ... personal consumption, and valued the loss from Jerry Thompson's death, discounted to present value.

810 S.W.2d at 271. This calculation of the decedent's spending habits or consumption allowance is ignored. While not assigning a precise dollar value to the loss of inheritance component of damages, Dr. Allen did provide evidence from which the jury could properly make its own assessment. However, nothing in *Yowell* mandates or even implies that expert testimony is a prerequisite to establishing this category of damages. We said there that:

> The plaintiffs introduced evidence as to each of the decedents' salaries, expected raises, expected promotions and salary increases, earning capacities, enforced savings through pension plans, spending habits, age, health, and relationship with the wrongful death beneficiaries. The plaintiffs also produced evidence of the age and health of the wrongful death beneficiaries.

703 S.W.2d at 634.[2] Although the evidence addressed here is quite similar to that upheld as legally sufficient in *Yowell* it will not suffice for this majority.[3]

Therefore, it is obviously not the amount of evidence offered by the Thompsons, which exceeded that presented in *Yowell*, but any recovery whatsoever for loss of inheritance damages to which the majority objects. Since "[t]he parties have not argued that we should revisit *Yowell*," 903 S.W.2d at 324, he simply criticizes the Thompson family for some vague failing in offering the same type of evidence approved by *Yowell*. The essence of the majority's thinking is captured by its conclusion that

> [t]he argument that loss of inheritance damages are inherently too speculative and should never be awarded, although rejected in *Yowell*, has not been disproved.

903 S.W.2d at 323. Not "disproved," indeed, this argument previously rejected by both this Court in *Yowell* and in the extensive authorities upon which we relied there, is today lovingly approved. The reasoning that we employed in 1986, the reasoning that others have embraced for decades, remains valid today: "[p]reventing the heir's recovery would protect the wrongdoer from the consequences of the wrong." 703 S.W.2d at 633. Here, that wrong means the denial of $200,000 in damages to Jerry Thompson's widow as determined by the jury, adjudged by the trial court, and affirmed by the court of appeals. For our broader jurisprudence, it means that the majority continues a disturbing trend of reversing the prior rulings of

---

**2.** *See also Lopez v. City Towing Assoc., Inc.*, 754 S.W.2d 254, 265 (Tex.App.—San Antonio 1988, writ denied) (detailing evidence sufficient to support award of loss of inheritance damages); *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1340 (5th Cir.1990) ("[Loss of inheritance] damages are recoverable [in Texas] 'where the decedent (1) would have enhanced his estate by some amount by saving some of his earnings or by prosperous management of his investments, and (2) would, in all reasonable probability, have left that amount upon his natural death to the plaintiff.' ") (quoting *Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278, 290 (5th Cir.1987)) (emphasis omitted).

**3.** The majority's contention that the evidence presented here also fails to meet the *Lopez* standard, 903 S.W.2d at 324, is contradicted by that decision:

> Mrs. Lopez had worked ten years in a day care center prior to the accident and had only quit her job one month before the accident. [She] obtained her G.E.D. and was promoted to teacher's aide and then to a teacher's position. Testimony indicated that Mrs. Lopez wanted to obtain a college degree so that she could return to work as an elementary school teacher or as a substitute teacher. There was testimony that Mrs. Lopez' earnings were not used to support the family, but were used to provide extra things for the family, primarily for the children. Finally, there was extensive testimony of Mrs. Lopez' close and loving relationship with the members of her family.

754 S.W.2d at 265. There is far more testimony in the record here as to the financial status and acumen of Jerry Thompson from which a jury could deduce the amount of the estate that would likely have been left by him than was held sufficient to support such an award in *Lopez*.

this Court through mischaracterization[4] and weakening the right to trial by jury.[5]

## II. Prejudgment Interest

The proper answer concerning prejudgment interest, the only issue on which we requested oral argument, is indisputable. No ambiguity, no statutory conflict, nor confusing legislative history is involved here. The statutory language at issue is clear and terse: "prejudgment interest accrues on the amount of the judgment...." TEX.REV.CIV. STAT.ANN. art. 5069–1.05, § 6(a). The phrase "amount of the judgment" means *all*, not *part;* it encompasses both past and future damages.

No state court in any reported case has ever experienced the slightest difficulty understanding this legislative command, and every Texas appellate judge to have previously considered these nine words has reached the same obvious conclusion. *See Wal–Mart Stores, Inc. v. Berry,* 833 S.W.2d 587, 596 (Tex.App.—Texarkana 1992, writ denied); *Hughes v. Thrash,* 832 S.W.2d 779, 787 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Sisters of Charity of the Incarnate Word v. Dunsmoor,* 832 S.W.2d 112, 115–16 (Tex.App.—Austin 1992, writ denied); *C & H Nationwide, Inc. v. Thompson,* 810 S.W.2d 259, 276 (Tex.App.—Houston [1st Dist.] 1991); *C.T.W. v. B.C.G.,* 809 S.W.2d 788, 795 (Tex.App.—Beaumont 1991, no writ); *Ellis County State Bank v. Keever,* 870 S.W.2d 63, 71–72 (Tex.App.—Dallas 1992), *aff'd in part and rev'd in part on other grounds,* 888 S.W.2d 790 (Tex.1994). Indeed, as one of these decisions concluded, the legislature "could have hardly used language which more clearly expressed a desire to allow a party to recover pre-judgment interest on the entire amount of the damages...." *C.T.W.,* 809 S.W.2d at 795. A diverse statewide committee that prepared recommendations to guide the bench and bar in the proper preparation of jury instructions has likewise advised that "it is no longer necessary to obtain separate answers for past and future damages to calculate prejudgment interest." STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES Comment to PJC 81.02 at 81–7.

There are several ways in which the legislature could have written its enactment to satisfy Justice Hecht. It could easily have defined "judgment" in such a way as to exclude future damages or said that prejudgment interest accrues only on past damages. Alternatively, it could simply have expanded its prohibition of prejudgment interest for certain types of damages[6] to prejudgment interest for future damages. But instead the legislature chose to define as "interest" a remedy which does not measure the value of lost use of money. Justice Hecht professes much conceptual distress with this legislative decision, describing it rather vividly as a "crucifi[xion] [of] language". 903 S.W.2d at 329 (Hecht, J., concurring and dissenting). But a body of lawmakers does not always deal in concepts and theories; it must resolve conflicts through give and take. Pragmatism—the art of compromise—predominates. The type of "linguistic purity" demanded by Justice Hecht, *id.,* has seldom been a theme of effective lawmaking nor a regular requirement of our constitution. Perhaps such an approach is desirable in academia, but it is

---

4. *See University of Texas Medical Branch at Galveston v. York,* 871 S.W.2d 175, 180–81 (Tex. 1994) (Gammage, J., dissenting) (effectively overruling longstanding precedent while purporting to distinguish it); *Dresser v. Lee,* 880 S.W.2d 750, 757 (Doggett, J., dissenting) ("By what it euphemistically labels reading [a prior decision] in 'context', the majority essentially reads that ruling out of the lawbooks.").

5. *See, e.g., Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 459–67 (Tex.1993) (Doggett, J., concurring and dissenting); *Boyles v. Kerr,* 855 S.W.2d 593, 609–10, 616 (Tex.1993) (Doggett, J., dissenting); *May v. United Services Ass'n of America,* 844 S.W.2d 666, 675 (Tex. 1992) (Doggett, J., dissenting); *LeLeaux v. Hamshire–Fannett Indep. Sch. Dist.,* 835 S.W.2d 49, 55–56 (Tex.1992) (Doggett, J., dissenting); *Crim Truck & Tractor v. Navistar Intern. Transp. Corp.,* 823 S.W.2d 591, 599 (Tex.1992) (Mauzy, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 491 (Tex.1991) (Doggett, J., concurring and dissenting); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting).

6. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 41.006 (Supp.1993), which excludes prejudgment interest for punitive damages on causes implicated under TEX.CIV.PRAC. & REM.CODE ANN. § 33.001 (Supp.1993).

not appropriate for a court of law that is obligated to enforce what the legislature enacts.

The compromise struck here is documented by two of the principal proponents of "tort reform", who agreed during legislative negotiations to yield a modest concession to their opponents by applying prejudgment interest to future damages. Senator John Montford has described his sponsorship of broad "tort reform" legislation advanced by the insurance industry and other lobby groups operating under the title "Texas Civil Justice League". *See* John Montford and Will Barber, *1987 Texas Tort Reform: The Quest For a Fairer and More Predictable Texas Civil Justice System,* 25 HOUS.L.REV. 59, 80–83 (1988). This article devotes fifteen pages to describing the six separate changes that were involved in "strik[ing] a new balance" with regard to prejudgment interest. *Id.* at 102–16.

These two tort reform advocates are as unequivocal as every previous Texas judge that in "modifying *Cavnar v. Quality Control Parking, Inc.*," 696 S.W.2d 549 (Tex.1985), the statute "expands prejudgment interest to future damages included in the judgment." *Id.* at 102.[7] In addition to noting, at least four times, this obvious effect of the statute, they provide an illustrative case example as a practice guide so that attorneys will not be confused by the legislative changes. *Id.* at 103–04. This particular section of their writing is not some after-the-fact, self-serving affidavit of a single legislator or an attempt to embellish and expand language that the legislature did not approve. Were that the purpose of their writing, I would agree with Justice Hecht that it would "provide little guidance as to what the legislature collectively intended." 903 S.W.2d at 328. But in what is really the legislative equivalent of an admission against interest, the sponsor is only outlining a concession made in order to

achieve enactment of an entire legislative package. This product of legislative compromise is candidly described:

> From a tort reform policy perspective section 6(a) [of the prejudgment interest statute] is a trade-off provision. Shortening of the accrual period promotes the policies of the tort reform laws, while applicability to future damages does not.

*Id.* at 104. *See also id.* at 105 (referencing their legislation as "expanding *Cavnar*'s scope to include future damages"). Quite clearly the legislature's word choice was not casual. Hence, the trial court in awarding prejudgment interest on all damages and the court of appeals in affirming that judgment were simply enforcing what the legislature wrote.

### III. Contribution and Set-off

The same legislative effort which affected prejudgment interest also yielded a complex revision of the law governing contribution rights among multiple defendants and defining the effect of any settlements. The statute clearly defines what is necessary to constitute a "settling person"[8] and provides that the effect of a

> claimant['s] ... settle[ment] with one or more persons [is to] reduce the amount of damages to be recovered ... by ... the sum of the dollar amounts of all settlements.

TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(b)(1) (1993). Before the jury deliberated, C & H entered into a partial settlement with the Thompsons. For purposes of deciding whether the amount of this settlement will reduce the Thompsons' recovery against the other defendants pursuant to this provision, the majority correctly acknowledges that the language means what it says—the statutory

---

7. *See also id.* at 103: "Section 6(a) also expands the *Cavnar* reach of prejudgment interest, which included only past damages (damages that have accrued by the time of judgment) to apply also to future damages included in the judgment."

8. TEX.CIV.PRAC. & REM.CODE ANN. § 33.011(5) (1993) provides:

> "Settling person" means a person who at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability pursuant to the provisions of Section 33.001 with respect to the personal injury, property damage, death, or other harm for which recovery of damages is sought.

definition does not limit settling persons to those who have fully resolved all claims against them; rather it includes those who settle only part of their liability.

903 S.W.2d at 319. Although remaining a defendant subject to liability in this case, C & H has entered a partial settlement that is statutorily mandated to benefit all defendants, each of which enjoys a reduction in the amount due the plaintiffs equal to a proportionate share of the amount paid by C & H to resolve the claim against it.

But the term "settling person" is employed more than once; another section of the same statute tersely mandates that "[n]o defendant has a right of contribution against any settling person." TEX.CIV.PRAC. & REM.CODE ANN. § 33.015(d) (1993). Applying this clear command, the court of appeals properly concluded that C & H, as a "settling person", should not be liable for claims of contribution brought by a co-defendant, such as Ecotech. Displeased with this result, the majority refuses to enforce the statutory inclusion of partially settling persons. Preferring euphemistically its own "better reading" of this legislative enactment, the majority rewrites the direct and simple command of section 33.015(d) to provide that "a settling person is free from contribution only to the extent of the liability settled." 903 S.W.2d at 319. One consequence is to remove by judicial fiat the statutory protection from contribution claims that a company like C & H had a right to expect when it made a settlement payment to the Thompsons.

9. Consistent application of the statutory definition of "settling persons" would benefit claimants such as the Thompson family—a result this majority consistently disfavors. It is noteworthy that the majority does not give plaintiffs the same benefits of the type of "better reading" he accords when statutory language anomalously harms defendants. If a "better reading" of section 33.015(d) would interpret "any settling person" to mean "any settling person to the extent of the liability settled," surely it is also a better reading of section 33.012(b) to interpret the "dollar amounts of all settlements" to mean all settlements to the extent they settle the same type of liability found by the jury. Such a reading would prevent settlement funds from offsetting a plaintiff's recovery against nonsettling defendants as long as the settlement did not bar contribution claims against the settling party.

The contribution section merited only a regular reading, but to avoid a perceived "anomaly" the recovery credit section gets this new, improved form of perusal. "Review[ing] the statute for fairness" is "beyond [the Court's] power" as to the contribution action, 903 S.W.2d at 320, but represents the very course that the majority must pursue with reference to the recovery credit section.[9] In reality, the statute's meaning thus shifts from section to section in accord with the whims not of a judicial reader, but a judicial writer.

On rehearing, the majority no longer disputes that a severally liable defendant like Energy Coatings has potential contribution liability for its comparative percentage of the verdict, rather than the judgment. *Compare* 37 Tex.Sup.Ct.J. at 154 (Hecht, J., for the majority) (holding Energy Coatings is liable in contribution to the extent it has not paid its proportion of the judgment). Section 33.015(a) sets the maximum contribution obligations of those defendants who are not jointly and severally liable as their individual percentage of damages found by the *trier of fact*[.] Subsection (b), in contrast, provides that each jointly and severally liable defendant can be liable for contribution to each other for

> the damages recoverable by the claimant under Section 33.012 in proportion to his respective percentage of responsibility.

The obvious difference in language in these parallel subsections has to do with whether

It may well be anomalous, absurd and unfair for a partial settlement that does not limit nonsettling defendants' contribution recovery against the settling defendant to nevertheless limit the plaintiff's recovery against the nonsettling defendants. This result of the majority's inconsistent reading of Chapter 33 also runs contrary to our previous common law jurisprudence on contribution. *See, e.g., Cypress Creek Utility Service Co. v. Muller,* 640 S.W.2d 860, 863 (Tex.1982) (settlement credit given nonsettling defendants constitutes a substitute for the right of contribution nonsettling defendant would have had against the settling defendant if that defendant had not settled).

I would construe all provisions of the statute consistently, as written, to bar all contribution claims against settling defendants as well as reduce the plaintiffs' recovery by the amount received in consideration of the settlement.

the co-defendants' maximum contribution liabilities are its percentage of damages found by the jury, or its percentage of the amount of damages recoverable by the plaintiff, after the reductions required by section 33.012 have been made. In this case, as in many others, the difference is significant. The amount of damages found by the trier of fact is $8,205,720.35, while the net damages recoverable by the plaintiff is $2,205,720.35. Under the plain language of subsection (a), Energy Coatings' contribution liability should be five percent of the greater amount; its maximum contribution liability to jointly and severally liable defendants is its "percentage of damages found by the trier of fact."

By a strained interpretation of section 33.015(a), however, the majority holds that Energy Coatings can have no contribution liability to C & H or Ecotech. Under that section, contribution may be sought against a severally liable defendant by a jointly and severally liable defendant who

> pays a percentage of the damages for which the defendant is jointly and severally liable greater than his percentage of responsibility....

§ 33.015(a). The phrase "damages for which defendant is jointly and severally liable" is an obvious and straightforward reference to

> damages recoverable by the claimant under Section 33.012 [against] defendants who [are] jointly and severally liable....

§ 33.015(b). Section 33.012 damages are percentages of amounts recoverable under the judgment, rather than amounts awarded by the jury. §§ 33.012; 33.013(b). Thus, under section 33.015(a), a jointly and severally liable defendant is entitled to contribution from a severally liable defendant when it pays to the plaintiff more than its percentage of responsibility for the judgment. There is no threshold requirement that it pay more than its percentage of the jury verdict.

By obscure reasoning, the majority concludes the opposite—that a jointly and severally liable defendant has no contribution rights against a severally liable defendant

unless it has paid more than its required percentage both of the judgment damages and the jury verdict damages. 903 S.W.2d at 318. In other words, the majority interprets the words "jointly and severally liable" in section 33.015(a) to refer both to the defendant's joint and several liability under § 33.013(b) as well as that defendant's several liability under § 33.013(a). *Id.* The only legitimate way for the statute to have this meaning would be by substituting the word "or" for the word "and" in the controlling phrase from section 33.015(a):

> If a defendant who is jointly and severally liable under Section 33.013 pays a percentage of the damages for which the defendant is jointly ~~and~~ [or] severally liable greater than his percentage of responsibility, that defendant has a right of contribution....

Despite the majority's ironic averment that it relies on a "literal reading" of section 33.015(a), its approach in fact requires that the language of that section be ignored.

Under the statute, C & H and Ecotech are jointly liable for the damages recoverable by Thompson. § 33.013(b). If, by virtue of their several liability for their respective percentages of the jury verdict, § 33.013(a), either one pays more than their percentage of comparative responsibility for the damages recoverable by Thompson, then they can seek contribution against Energy Coatings, to the extent the latter has not paid 5% of the damages recoverable under the jury verdict. I would so hold.

## IV. Conclusion

Today's opinion effectively rejects both our decisional law on loss of inheritance damages and a legislative command on handling multiple parties in complex litigation. With reference to Chapter 33 of the Texas Civil Practice and Remedies Code, the majority accomplishes a judicial rewrite that was only very narrowly avoided for the prejudgment interest statute.[10] This is not statutory construc-

---

10. The majority also reaches out in an attempt to limit the right to trial by jury with unnecessary dicta addressing a subargument that an award of prejudgment interest on future damages violates

Article I, Section 15 of the Texas Constitution. This contention was not the subject of any writing by the court of appeals or any oral argument or authority cited by the parties and merited all

tion, it is statutory deconstruction.[11] Preferring to respect both the precedent of this Court and the relevant legislative enactment, I would affirm the judgment of the trial court except with regard to the ultimate contribution obligation of Energy Coating.

of one sentence in the brief of one Defendant and three sentences in that of the other. *See* 903 S.W.2d at 327.

11. Only recently Justice Hecht attempted to apply this same approach to a civil service statute that met with his personal disapproval. *See Tijerina v. City of Tyler*, 846 S.W.2d 825, 829 (Tex. 1992) (Hecht, J., dissenting). There this court resisted the temptation to meddle:

While we may permissibly consider public policy in construing the intent of the Legislature from an ambiguous provision, we cannot rewrite or ... deconstruct a plainly worded statute because we believe it does not effectuate sound policy.

846 S.W.2d at 828.