**SAUDER CUSTOM FAB, INC., Appellant,**

v.

**Carl R. BOYD, Rhonda Boyd, and Johnson Filtration Systems, Inc., Appellees.**

No. 09–95–149 CV.

Court of Appeals of Texas, Beaumont.

Submitted May 30, 1996.

Decided Oct. 31, 1996.

Publication Ordered June 23, 1998.

Earnest W. Wotring, Mayor, Day, Caldwell & Keeton, L.L.P., Houston, Dale Dowell, Rienstra, Dowell & Flatten, Beaumont, for appellant.

Cris E. Quinn, Richard J. Clarkson, Reaud, Morgan & Quinn, Inc., Beaumont, James M. Harris, Jr., Harris, & Lively, P.C., Beaumont, for appellees.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

BURGESS, Justice.

Carl R. Boyd (Boyd) and wife Rhonda originally filed suit against Sauder Custom Fab, Inc., (Sauder) and others to recover damages Boyd suffered from falling approximately 50 feet inside a regeneration tower. Johnson Filtration Systems, Inc., (Johnson), the manufacturer of component parts known as screens, was later made a defendant. Sauder also cross-acted against Johnson contending Johnson was responsible for any alleged marketing defect in the regeneration tower.

By a ten-two verdict, the jury found a marketing defect in the regeneration tower and its component parts, including shipping rings, at the time it left the possession of Sauder, and that such defect was a producing cause of Boyd's injuries. The jury also found the marketing defect resulted from conduct on the part of Sauder. The jury failed to find a marketing defect existed as to the shipping rings at the time they left Johnson's possession.

The jury also found Sauder, Litwin [1] and Boyd were all negligent, and such negligence was a proximate cause of the injuries in question. The jury apportioned negligence at 50% for Sauder, 25% for Litwin, and 25% for Boyd. The jury exonerated Johnson from any negligence. Sauder brings five points of error. The first three are:

> Point of Error I: The trial court erred in overruling Sauder's motion for instructed verdict and motion for new trial because Sauder did not owe a duty to warn Boyd of the obvious danger of the shipping ring falling.

---

1. Litwin was the general contractor on a project for Mobil Oil Corporation. Litwin is not a party to this appeal.

Point of Error II: The trial court erred in overruling Sauder's motion for new trial because the evidence admitted at trial was factually insufficient to support the jury's determination that the regeneration tower contained a marketing defect.

Point of Error III: The trial court erred in overruling Sauder's motion for instructed verdict and motion for new trial because the evidence admitted at trial was legally and factually insufficient to support the jury's determination that Sauder was negligent.

## APPLICABLE STANDARDS OF APPELLATE REVIEW

■ "We review the denial of an instructed verdict by a legal sufficiency or 'no evidence' standard of review." *City of Alamo v. Montes*, 904 S.W.2d 727, 732 (Tex.App.— Corpus Christi 1995, no writ). In determining a no evidence point, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993).

■ On the other hand, in determining an insufficient evidence point, we inquire whether the evidence is so weak or the contrary evidence so overwhelming that the finding should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). To make this determination, we consider all the evidence. *See Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 29 (Tex.1993).

## THE FACTS AND LAY TESTIMONY

Boyd was part of a crew of boilermakers tasked with removing shipping rings from a cylindrical screen which was in a vertical position inside a 50-foot high pressure vessel, manufactured by Sauder. The screen was designed and manufactured by Johnson. Since the screen was to be used in sensitive chemical processing its exact dimensions had to be maintained at all times. Therefore, Johnson installed several shipping rings in order to maintain the screen's proper physical integrity during shipping and installation.

The shipping rings were described as round pieces of iron, weighing approximately 150 pounds, whose circumferences were expanded against the inside surface of the screen by use of several tension, or jack, bolts. When these bolts were expanded, they pushed outward on the shipping ring, preserving the round shape of the screen. Conversely, when the tension bolts were unscrewed, the pressure holding the shipping rings in place was released.

Prior to beginning, the crew decided on a plan of action. Edward Boyd, the foreman and Boyd's brother, testified they had to decide what to do because there were no instructions on how to take out the rings. He had some carpenters measure the inside diameter of the screen and cut five or six wooden boards to match. The carpenters provided the boards and Boyd's crew placed them across the diameter of the screen; onto the second shipping ring. He was not concerned about the rings coming loose and the boards slipping. The rings were "jacked out with four bolts" and the bolts seemed to be snug. This resulted in the creation of a scaffold from where the crew was to work removing the shipping rings. Neither the boilermakers or the carpenters questioned using the shipping ring as the base for the scaffold. To actually remove the shipping rings, the crew planned to use a line from a crane to secure each shipping ring prior to loosening the tension bolts. The crane would eventually remove each ring from the inside of the screen.

The testimony is unclear as to how the scaffold collapsed. Boyd testified he loosened one bolt on the top ring before the crane was available. Boyd explained he took a wrench and "just put it on to make sure it wasn't gaulded[2] just enough to—for it to

---

**2.** There is no definition or explanation of "gaulded" in the record nor is it found in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981).

move.... Make sure, you know, the nut on it wasn't gaulded on the bolt where it would free up whenever the rig got there." In a matter of 30 seconds to a minute, Boyd fell. Boyd stated he could not tell which one of the rings actually slipped, the top one or the second one.

Two other men, J.C. Vaughn and his son, Clay Vaughn, were saved from falling to the bottom by their lanyards which were attached to the inside of the tower. Boyd's lanyard, attached to the outside of the tower, broke, causing him to fall to the bottom. As a result, Boyd sustained substantial injuries.

J.C. Vaughn testified he did not know, at the time, what caused the rings to fall, although he later discovered some of the rings, under the two in question, had missing bolts and loose bolts. Vaughn testified he saw no one loosen any bolts. He testified both rings fell and "just scissored."

Clay Vaughn testified he was close enough to Boyd to have seen or heard him loosening any bolts and if Boyd had been doing so, he (Vaughn) would have known it.

Charles Landry, a journeyman pipefitter, was the job superintendent and had recommended Edward Boyd for foreman. Landry testified he did not see anything wrong with placing boards on the ring and, at the time, thought it was a safe way to do it. Landry testified that if instructions had been provided he would have expected the foreman to follow those instructions and would have made sure the boilermakers had copies.

Sauder's representative testified the shipping rings were inspected both when the screen arrived at its facility from Johnson and just prior to the screen leaving for Mobil. He stated all of the bolts on the shipping rings were in place. There was testimony Sauder did not install the pressure vessels, but only manufactured them and later sold them to engineering firms and petrochemical plants for installation. There was testimony that prior to this lawsuit, Sauder had sold between 150 and 200 pressure vessels without any accident of a similar nature occurring. Such sales, according to Sauder's representative, were exclusively to purchasers such as Litwin and Mobil whose personnel possessed considerable engineering expertise and experience in installing pressure vessels.

## THE EXPERT TESTIMONY

Jack Larks, a registered professional and licensed engineer and a certified safety professional, was the Boyd's expert witness. Larks testified if users were not familiar with a product, then instructions and warnings were necessary. As to this particular accident, he stated it was obvious the boilermakers felt their method was safe since "nobody is going to put themselves in danger deliberately". It was his opinion that Sauder should have included instructions or warnings about the safe removal of the shipping rings. He said Sauder could have put a notice on the engineering drawings or could have required that color decals or labels be on the rings. He noted it would have been very easy to stencil, in yellow, an instruction or warning on the shipping rings, such as "Caution. Do not use as a support surface." or "No stepping." It was also his opinion that Sauder should have included a shipping package or plastic package containing warning and instructions regarding the shipping rings because the rings were a unique component and Sauder, as the fabricator, was in the best position to make sure a warning accompanied the regeneration tower. Furthermore, Sauder had given detailed instructions on how to remove the shipping rings on a different screen. It was Larks' opinion the product was defectively marketed in that there were no warnings or instructions regarding the dangers associated with the shipping rings. It was also his opinion that Sauder was negligent "in failing to recognize the hazard, avoid exposure of their people and others, and prevent creating the hazard or additional hazards."

Larks agreed with Sauder's counsel that Boyd's safety harness and lanyard should have had warnings or instructions about the proper placement of the lanyard over sharp edges. Larks agreed with Johnson's counsel that Johnson had no duty to provide warnings or instructions because Sauder was a sophisticated manufacturer and Sauder didn't require any warnings or instructions from

Johnson. It was Larks' opinion that Boyd would not have been injured if Sauder had given the proper warnings and instructions.

Sauder called John Sexton, a registered professional engineer and certified safety professional, as their expert witness. Sexton testified the makeshift scaffold, Boyd's lanyard and Boyd's use of it violated approximately eight OSHA[3] regulations. Sexton stated the lanyard and its use was not up to standards in that it was put over the sharp metal surface, it was a five-eights inch rope instead of a seven-eighths rope with a metal core and it was supposed to withstand 5400 pounds. Sexton testified it was Carruth–Dishman's[4] responsibility to ensure compliance with OSHA regulations and the accident would not have occurred if the OSHA regulations had been followed. It was Sexton's belief that the lanyard did not require any warnings. He had no criticism of the harness and lanyard manufacturer. Nor did he have any particular criticism of Litwin, Mobil or Johnson. It was Sexton's opinion neither Johnson nor Sauder should have put warnings on the shipping rings.

## CLOSING ARGUMENTS

In line with Larks' testimony, Boyd's attorney argued the product was defective because there were no instructions provided concerning the safe assembly and disassembly of the vessels and the screens and because there were no warnings on the shipping rings. He argued the evidence also proved Sauder was negligent, but provided the jury no details.

Sauder's attorney admitted none of the men who fell had received any warnings or instructions from Sauder, but the fact there were no instructions or warnings did not cause any harm. He stressed the one difference between the Vaughns' and Boyd's fall was that Boyd's lanyard severed. Consequently, any failure on the part of Sauder to give warnings played no part in the accident. He also argued if the boilermakers had waited for the crane, if a proper scaffold had been built or if they had not put boards on

the shipping ring, Boyd would not have been injured. He then argued no warnings or instructions were necessary because any warnings or instructions would essentially be saying follow the law and common sense. He reiterated there were four things that caused or contributed to the accident just as much as any failure to give instructions and warnings, if that did have any part of it. Those four things were: failure to erect proper scaffolding, use of shipping rings as supports for the scaffold boards, failure to wait for the crane, and allowing the lanyard to run over the edge of the vessel. He also argued the severing of the lanyard was a new and independent cause of the accident. He further argued the failure of the boilermakers' employer to have properly trained workers was a sole cause of the injury. He then argued that if the jury felt the failure to give warnings was a marketing defect, it was Johnson's failure and 100% should be attributed to Johnson since Johnson was the manufacturer.

Johnson's attorney argued none of the experts placed any blame on Johnson. He argued Johnson had no duty to provide any instructions or warnings since they only sold a component, the screens, to a sophisticated purchaser, Sauder.

## SUFFICIENCY OF THE EVIDENCE

■ Under points of error one and two, Sauder contends the vital fact missing from Boyd's proof at trial was any duty on Sauder's part to provide instructions and warnings with regard to the safe removal of the shipping rings. They argue there was no duty to warn Boyd of the obvious dangers associated with the removal of the shipping rings and there was no duty to warn Boyd of dangers of which he was already aware, relying upon *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379 (Tex.1995).

In *Caterpillar,* the court restated many of its prior holdings concerning products liability. For example:

This Court has adopted the theory of strict products liability expressed in sec-

---

**3.** Occupational Safety and Health Administration.

**4.** The boilermaker's employer.

tion 402A of the Restatement (Second) of Torts. *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788–89 (Tex.1967). The law of products liability does not guarantee that a product will be risk free, since most products have some risk associated with their use. The Restatement imposes liability only for products sold 'in a defective condition *unreasonably* dangerous to the user or consumer.' RESTATEMENT (SECOND) OF TORTS § 402A(1) (1965) (emphasis added). A product may be unreasonably dangerous because of a defect in manufacturing, design, or marketing. *See Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 (Tex.1979). A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect. *See Lucas v. Texas Indus., Inc.,* 696 S.W.2d 372, 377 (Tex.1984). Liability will attach if the lack of adequate warnings or instructions renders an otherwise adequate product unreasonably dangerous. *Id.*

. . . .

Similarly, this Court has recognized that there is no duty to warn when the risks associated with a particular product are matters 'within the ordinary knowledge common to the community.' *Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 388 (Tex.1991)(holding that there is no duty to warn of the dangers of excessive or prolonged use of alcohol since these dangers are already so widely recognized). *Seagram's* rationale applies with equal force to products with risks that are obvious to anyone who observes the product. In these circumstances, a warning is not required. Thus, the duty to warn is limited in scope, and applies only to hazards of which the consumer is unaware.

A number of courts have observed that a warning that merely states the obvious would accomplish very little and to the contrary may actually be counterproductive. The fact that a risk is readily apparent serves the same function as a warning. *See Hagans [v. Oliver Mach. Co.,]* 576 F.2d [97 (5th Cir.1978) ] at 102 (after noting the 'obvious' dangers of a table saw, stating that 'a warning of the dangers involved in using the saw would not have

informed [the plaintiff] of anything he did not already know'). Warnings about obvious hazards are not likely to reduce the chances of injury. *See Bavuso [v. Caterpillar Indus., Inc.,]* 408 Mass. 694, 563 N.E.2d [198 (Mass.1990) ] at 201. Moreover, consumers are prone to ignore warnings of obvious dangers, thereby diminishing the importance given by users to warnings about non-obvious hazards. *See General Motors Corp. v. Saenz,* 873 S.W.2d 353, 360–61 (Tex.1993). Thus we hold that the law of products liability does not require a manufacturer or distributer [sic] to warn of obvious risks.

*Id.* at 381–382 (alteration in original) (citation omitted).

The court further expounded upon its holding in *Seagram:*

To understand our holding in *Seagram,* two aspects of the opinion are particularly important. First, the inquiry whether a recognition of risk 'is within the ordinary knowledge common to the community' is an objective standard. *See id.* at 388. Likewise, we conclude that whether a product has obvious dangers requires an objective standard. *See* RESTATEMENT (SECOND), *supra,* § 402A cmt. i; Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS 96, at 686–687 (5th ed.1984). The determination whether a manufacturer has a duty to warn is made at the time the product leaves the manufacturer. *Saenz,* 873 S.W.2d at 356. Therefore, courts necessarily must make the judgment of whether a product is unreasonably dangerous from an objective viewpoint. *See* KEETON, *supra,* 96, at 686–87. . . .

A second important aspect of the *Seagram* opinion is that we decided whether the risk of injury was common knowledge as a matter of law. 814 S.W.2d at 388. (However, we did not foreclose the possibility that in some situations there could be a fact question about whether consumers have common knowledge of risks associated with a product. *See id.* at 388 n. 6.) We were able to decide *Seagram* as a matter of law because the dangers of prolonged and excessive use of alcohol were "so well

known to the community as to be beyond dispute." *Id.* at 388 . . . .

*Id.* at 383.

In applying the facts to the law, the court in *Caterpillar* stated:

Shears was experienced with the operation of various kinds of heavy equipment. He testified that, although he had seen machinery equipped with a ROPS, he thought it was to protect the operator from the weather, and had no idea of the risks of operating a front-end loader without a ROPS. However, the testimony of one individual does not control a court's determination of whether a risk is open and obvious as a matter of law under an objective standard. *See Seagram*, 814 S.W.2d at 388 . . . . Therefore, Shears' subjective testimony that he had no idea the lack of a ROPS was unsafe in a collision is not determinative.

. . . The same can be said in the present case about the dangers of using an 18,000–pound front-end loader without its protective equipment. The inquiry is not whether the average person would know that a ROPS makes a loader safer. Rather, the proper inquiry is whether an average person would recognize that operating an industrial vehicle with open sides and top presents a degree of risk of serious harm to the operator. We believe it beyond dispute that the average person, looking at the open cab of a Caterpillar 920 front-end loader, would understand that nothing stands in the way of an intrusion from the rear or above. As a matter of law, Caterpillar and B.D. Holt did not have the duty to warn of the dangers of operating the loader as an open cab without a ROPS.

*Id.* at 383 (citations omitted).

Although the experience of the men involved was considerable, it apparently cannot be considered in an evidentiary review in deciding whether a risk of injury was common knowledge as *Caterpillar* provides a proper inquiry focuses on the perspective of "an average person." *Id.*

Thus, superimposing the *Caterpillar* standard on this case: The inquiry is not whether the average person would know that placing

warnings on the shipping rings or the screen makes them safer. Rather, the proper inquiry is whether an average person would recognize that using the shipping rings for support presents a degree of risk of serious harm.

Consequently, we cannot say it is beyond dispute that the average person, looking at the shipping rings and the screen, would understand that the weight of several wooden boards and three men would cause the shipping ring to fall. Therefore, the evidence is legally sufficient on the issue of duty and marketing defect.

■ In discussing negligence, the court in *Caterpillar* said:

The focus for negligence is on the supplier's standard of care. This perspective differs from that of strict liability, as follows:

The care taken by the supplier of a product in its preparation, manufacture or sale, is not a consideration in strict liability; this is, however, the ultimate question in a negligence action. Strict liability looks at the product itself and determines if it is defective. Negligence looks at the acts of the manufacturer and determines if it exercised ordinary care in design and production.

*Gonzales v. Caterpillar Tractor Co.*, 571 S.W.2d 867, 871 (Tex.1978).

*Id.* at 384. Jack Larks' testimony was some evidence of Sauder's negligence. Therefore, the evidence is legally sufficient on this issue also.

■ As to the factual insufficiency, the evidence was uncontroverted as to many of the facts, but highly controverted through the experts as to duty, negligence, and causation. "The general rule is that the trier of fact, in this case the jury, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. In resolving contradictions and conflicts, the jury may choose to believe all, part, or none of the testimony of any one witness in arriving at the finding it concludes was the most reasonable under the evidence." *Silva v. Enz*, 853 S.W.2d 815, 817 (Tex.App.—Corpus Christi 1993, writ denied)(citing *Garcia v. Dependa-*

*ble Shell Core Machines, Inc.*, 783 S.W.2d 246, 248 (Tex.App.—Corpus Christi 1989, no writ)). *See also Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978); *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (Tex.1951); *Potter v. Anthony Crane Rental of Texas, Inc.*, 896 S.W.2d 845 (Tex.App.—Beaumont 1995, writ denied).

Having applied the appropriate standard and reviewed the evidence as set out above, the jury's findings concerning both a marketing defect and negligence is not so against the great weight and preponderance of the evidence as to be manifestly unjust. Therefore, the evidence is not factually insufficient on the issues of marketing defect and negligence. We overrule points of error one, two and three.

### JOHNSON'S RESPONSIBILITY

■ Point of error four states:

If this court affirms the judgment against Sauder, it should set aside the jury's determination that Johnson was not responsible for the alleged marketing defect as being against the great weight and preponderance of the evidence as argued in Sauder's motion for new trial.

As previously outlined above, Sauder's own expert testified he had no particular criticism of Johnson. Furthermore, it was his opinion that neither Johnson nor Sauder should have put warnings on the shipping rings. Consequently, the jury's finding that Johnson was not responsible for the alleged marketing defect is not so against the great weight and preponderance of the evidence as to be manifestly unjust. This point of error is overruled.

### PREJUDGMENT INTEREST

The final point of error alleges:

The trial court erred in overruling Sauder's motion for new trial because Sauder [sic] was not entitled to prejudgment interest because Boyd failed to segregate his past and future damages.

This issue was resolved by our Supreme Court in *C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 324 (Tex.1994)(citing

TEX.REV.CIV. STAT. ANN. art. 5069–1.05, § 6(a) (Vernon 1987 & Supp.1996))[5] where the court held prejudgment interest is allowed on both past and future damages. This point of error is overruled.

The judgment is affirmed.

AFFIRMED.

WALKER, Chief Justice, concurring.

Originally, this case was assigned to me for writing the majority opinion. I did indeed draft that opinion reversing the trial court's judgment based on the jury's verdict, rendering judgment that appellees take nothing from appellant Sauder. My fellow Justices, Burgess and Stover, disagreed with my position, proffering the present majority opinion. It became my obvious intent to file a dissent to the present majority. A closer and more in-depth review of *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379 (Tex.1995) leads me to concur rather than dissent. In my original draft, I gave some weight to the fact the Boyd work crew were seasoned boilermakers with combined experience of over 100 years. *Caterpillar* does not focus upon the experience of the user or the intended user but rather upon the perspective of "an average person." Under *Caterpillar*, I must agree with the majority that the inquiry is not whether the average person would know placing warnings on the shipping rings or the screen makes them safer. The proper inquiry is whether an average person would recognize using the shipping rings for support presents a degree of risk of serious harm. The majority concludes we cannot say it is beyond dispute that the average person, looking at the shipping rings and the screen, would understand that the weight of several wooden boards and three men would cause the shipping ring to fall.

In my original draft, which now rests in that vast cemetery of well-intended drafts, I provided the following footnote:

Although the experience of the men involved was considerable, it apparently cannot be considered in an evidentiary review in deciding whether a risk of injury was

---

**5.** Applicable to all suits commenced on or after September 2, 1987.

common knowledge as *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 383 (Tex.1995), states a proper inquiry focuses on the perspective of 'an average person.' Query: Should there not be two 'objective' standards in determining whether an alleged risk is open and obvious; one for products generally available to the average adult consumer, and one for highly technical or complex products designed and marketed *only* to consumers possessing a degree of specialized training or expertise in making use of said product? (In the instant case, for example, it is not disputed Sauder designed and marketed regeneration towers, and their component parts, only to 'consumers' with the experience and expertise to properly install and make use of such products.)

I now believe that *Caterpillar* compels my concurrence and agreement with the present majority.